Nathalie SHULTZ et vir, Appellants,

v.

RESTHAVEN CEMETERY, INC., et al.,
Appellees.

No. 14187.

Court of Civil Appeals of Texas.

Houston.

Jan. 30, 1964.

Rehearing Denied Feb. 20, 1964.

J. Leonard Gotsdiner, Ranseler O. Wyatt, Houston, for appellants.

Hamblen & Hamblen, W. P. Hamblen, Jr., Houston, for appellees.

WERLEIN, Justice.

This suit was originally filed on April 30, 1952 by J. Popperman against Resthaven Cemetery, Inc., a dissolved corporation, and the former stockholders thereof as trustees for its creditors, based upon two promissory notes dated November 1, 1947, allegedly executed by Resthaven Cemetery, Inc., payable on or before May 1, 1948 to J. Popperman in the principal sums of $8,466.94 and $11,967.95, representing respectively services performed for, and loans advanced to, the Corporation by him.

The first trial of this case resulted in an instructed verdict in favor of the defendants on the ground that one of the purported directors of the Corporation executing the notes sued upon owned no stock in the Corporation and therefore was not qualified to act as a director. Such judgment was affirmed by the Court of Civil Appeals (341 S.W.2d 476), but was reversed by the Supreme Court (345 S.W.2d 715), the court holding in effect that said purported director could have acted if he was a de facto director. The court also held that the burden of establishing the fairness of the transaction to the Corporation was upon Popperman.

During the pendency of the suit J. Popperman died and his daughter, Nathalie Shultz, joined by her husband, Herman Shultz, were substituted as party-plaintiffs and are appellants herein. Based upon the jury verdict, the court entered judgment that appellants take nothing against appellees.

Appellants' first three Points, though peculiarly worded, can be construed only as "no evidence" points. They assert that the court erred in rendering judgment on the verdict of the jury and in overruling their motion for an instructed verdict, and in overruling their motion for judgment notwithstanding the verdict. Manifestly, the court did not err in such regard if there is any evidence of probative force in support of the judgment. In White v. White, 1943, 141 Tex. 328, 172 S.W.2d 295, our Supreme Court held, in determining whether it was proper to instruct a verdict, that if the record reflects any testimony of probative force, such an instruction would be improper. The court stated: "A peremptory instruction is warranted only when the evidence is such that no other verdict can be rendered and the winning party is entitled, as a matter of law, to a judgment. Stevens el al. v. Karr, 119 Tex. 479, 33 S.W.2d 725." The trial court properly refused to grant judgment non obstante veredicto if there was any evidence having probative force upon which the jury could have made their findings. Burt v. Lochausen, 1952, 151 Tex. 289, 249 S.W.2d 194.

We gather from the statement, argument and authorities of appellants that it is their contention that they met their burden of

proof by showing that the transactions between Popperman and the Cemetery, upon which their suit was based, were fair in every way, and that the notes in question were properly authorized and are valid legal obligations of the appellees. In order to understand what is involved, it is necessary to state briefly the facts leading up to appellants' suit.

On June 4, 1942 one W. S. Swilley and members of his family, who were the owners of all of the capital stock of Resthaven Cemetery, Inc., sold such stock to one F. Swirsky for the sum of $25,000.00, evidenced by a promissory note payable in six years. The stock of the Corporation was pledged as security. The day after the sale F. Swirsky assigned 499 shares of the total 1000 shares of stock to J. Popperman subject to the terms of the purchase contract with W. S. Swilley. At the next meeting of the new directors of the Corporation held July 31, 1942, the minutes reflect that J. Popperman had purchased the remaining stock owned by Swirsky and was the owner of all the corporate stock with the exception of two qualifying shares assigned by him to directors.

The note executed by Swirsky was not paid at its maturity, and appellees, as owners thereof, made demand for payment and upon default, made demand for the return of the pledged stock. At about that time appellees were informed by J. Popperman that Resthaven Cemetery, Inc. had executed and delivered to him said promissory notes in the sums of $8,466.94 and $11,967.95. Popperman refused to agree to the redelivery of the pledged stock unless the notes were paid and upon appellees' refusal to acknowledge the validity of the debts evidenced by such notes, the issue was resolved by a non-prejudice agreement, being plaintiffs' Exhibit No. 25. The capital stock of the corporation was thereupon redelivered to the heirs and devisees of W. S. Swilley, the individual appellees herein, he having previously died. Thereupon Resthaven Cemetery, Inc. was dissolved and appellees herein reincorporated under the name Resthaven Memorial Gardens.

Appellees set up various defenses, including lack or failure of consideration, lack of authority on the part of the directors and officers of the Corporation who purported to execute such notes, limitation, and further that the execution of such notes was in fact the act and deed of J. Popperman, he being the alter ego of the Corporation, and that such notes were, therefore, void and constituted a fraud upon the Corporation.

In answer to the first 15 Special Issues, all of which were requested by appellants, the jury found that J. Popperman was not employed on or about June 5, 1942 to act as manager of the Cemetery; that the work performed by him in his managerial capacity was not exclusive of the duties performed by him as an officer and director of Resthaven Cemetery, Inc.; that J. Popperman had not advanced or loaned to the Cemetery various amounts of money; that the note executed by Louis R. Jamail and Howard Hebert, acting as officers of Resthaven Cemetery, Inc. on November 1, 1947, in the sum of $8,466.94, did not represent the amount which said officers determined was the correct amount due J. Popperman for unpaid salary from June 5, 1942 to November 1, 1947; that said officers, Jamail and Hebert, were mistaken as to the correct amount of money which was due and owing J. Popperman for unpaid salary for the period of June 5, 1942 to November 1, 1947, and that no amount was due and owing him at the time said note was signed; that the note executed by Louis R. Jamail and Howard Hebert, acting as officers of Resthaven Cemetery, Inc., on November 1, 1947, in the sum of $11,967.95, did not represent the amount which said officers determined was the correct amount due Popperman for money loaned to the Corporation during the period of June 5, 1942 to November 1, 1947; that said officers were mistaken as regards the correct amount of money, if any, which was due and owing said J. Popperman for money loaned or advanced to said Corpora-

tion during such period; and that no amount was due the said Popperman at the time said note was signed, for money loaned or advanced by him to Resthaven Cemetery, Inc.

Other Issues conditioned upon affirmative answers to some of the foregoing Issues were not answered by the jury.

To the four Special Issues requested by appellees the jury found that at the special meeting held on the 5th day of June, 1942, the Board of Directors of Resthaven Cemetery, Inc., in voting J. Popperman a salary of $———, did not intend that Popperman should decide the amount of compensation he should receive for his services as manager of the Company; that from June 5, 1942 until June 17, 1948 J. Popperman did not devote all his time to the conduct of the business of Resthaven Cemetery, Inc.; that on November 1, 1947, when the Board of Directors of the Cemetery passed a resolution authorizing Howard Hebert, vice president, to execute two notes payable to J. Popperman in the amounts of $11,967.95 and $8,466.94, respectively, Louis R. Jamail had a personal financial interest in the passage of such resolution; and that the said Howard Hebert, in performing the duties of a director of Resthaven Cemetery, did so under the direction and in the interest of J. Popperman.

Appellants contend that there is no evidence in support of the jury findings. Appellees assert that there is ample evidence of probative force in support of the findings upon which the court's judgment is based. They take the position that J. Popperman was the alter ego of Resthaven Cemetery, Inc. and that in truth and in fact he was dealing with himself in his alleged transactions with the Corporation. In support of their contention that the Corporation was the alter ego of J. Popperman who owned all the corporate stock except 2 shares, and controlled all the assets of the Corporation, and who named the officers and directors of the Corporation who held office at his will and who controlled all of the acts of the officers and directors, appellees offered in evidence as an admission a portion of appellants' second amended original petition wherein it is alleged:

"During all of the time from July 25th, 1942 to June 17th, 1948 Plaintiff owned all of the stock of said corporation excepting the shares of Mrs. Bryant, L. R. Jamail and Howard Hebert as above alleged and exercised all of such rights and privileges incident to such ownership and to the management and control and supervision of said corporation which rights and privileges included the right so exercised of electing Directors for said Corporation."

They also offered in evidence certain testimony of Louis Jamail, an officer and director of the Corporation, who, when shown a draft in the sum of $250.00, dated March 8, 1944, drawn by Jamail on his bank and endorsed by J. Popperman and deposited in the First National Bank of Houston, testified as follows:

"Q Do you know where the other checks were deposited, sir?

"A First National. They were all the same.

"Q Do you know whether or not Mr. Popperman had a personal account in the First National Bank?

"A He did not.

"Q At any time at all? Do you know that for sure?

"A There is a possibility that I wouldn't know, but from all my dealings with him, I knew he didn't have one. If he had, it was a secret account he didn't divulge to anyone. That I don't know."

On cross-examination the same witness testified:

"Q I understand, Mr Jamail, the testimony elicited by counsel for the plaintiff from you was to the effect

that Mr. Popperman had only one bank account?

"A That's right.

"Q That bank acount was the one upon which he drew checks on the account of Rest Haven Cemetery, Inc.?

"A That's right.

"Q Even though the two checks identified as Plaintiff's Exhibits Nos. 42 and 43, are payable to Mr. J. Popperman and are endorsed only by Mr. J. Popperman, those moneys actually went into the cemetery account?

"A Yes sir."

In further support of their contention, appellees offered in evidence from the books of account of the Corporation, kept under the direction of J. Popperman, establishing that out of the Cemetery bank account payments in excess of $8,700.00 were made either directly to J. Popperman or in payment of his personal obligations, including cash withdrawn by Popperman for personal expenses, totaling $2,812.42, a personal income tax bill in the sum of $484.64, Social Security and Withholding taxes in the amount of $879.66, principal payments upon the Swirsky $25,000.00 note totaling $3,125.-00, interest payments on such note totaling $1,220.66, one or two small doctor bills, a legal fee, and a $500.00 payment to Louis Jamail.

From such testimony it appears that the Corporation was the alter ego of J. Popperman. The jury, in answering the Special Issues, apparently accepted appellees' theory of the case and concluded that Popperman was the Corporation for all practical purposes. They had before them evidence that J. Popperman used the Corporation to effectuate his own purposes and interests. He treated the money that was in the account of the Corporation as belonging to him and used the same to pay his bills. He exercised all rights and privileges incident to his ownership of all of the stock regardless of the two outstanding qualifying shares. He controlled and supervised the Corporation and exercised the right of electing directors for the Corporation, and directed and controlled the actions of such directors. The jury found that Popperman was not employed to act as manager of the Cemetery. Such finding could well be based upon appellees' contention and the evidence hereinabove referred to, that the purported contract of employment of Popperman as manager of the Cemetery was in fact a contract between Popperman and himself, and that the moneys advanced by Popperman allegedly to the Corporation were in fact advancements to himself for his own personal use and benefit, since such funds were freely used for such purpose.

■ The law is well settled that a director of a corporation cannot with propriety deal in his own behalf in respect of the corporate property, or in respect of any matters involving the exercise of his duties as a director. In Texas Auto Company v. Arbetter, Tex.Civ.App., 1 S.W.2d 334, the court said:

"Such contracts, when made with the efficient aid of the contracting director, are presumptively invalid, and the burden of showing that they are entirely fair is upon those claiming under them; and they will always be subjected by courts of equity to the severest scrutiny, and set aside, unless all appearance of bad faith is removed by evidence. The courts will refuse to set aside such contract when, and only when, it is made to appear that it was openly and fairly made for an adequate consideration, and the corporation was adequately represented by other officers or directors. 14a C.J. pp. 112, 113, § 1880; Thompson, Corp. (1st Ed.) §§ 4042, 4043, 4059, 4060–4063, 4070–4077, 5650, 8500, 8501; San Antonio St. Ry. Co. v. Adams, 87 Tex. 125, 26 S. W. 1040; Fitzhugh v. [Franco-Texas] Land Co., 81 Tex. 306, 16 S.W. 1078;

Nueces Valley Irr. Co. v. Davis (Tex. Civ.App.) 116 S.W. 633; Id., 103 Tex. 243, 126 S.W. [4], 5; Greathouse v. Martin (Tex.Civ.App.) 91 S.W. 385; Id., 100 Tex. 99, 94 S.W. [322], 323; Tenison v. Patton, 95 Tex. 284, 67 S.W. 92."

In Felty v. National Oil Company of Texas, Tex.Civ.App., 155 S.W.2d 656, the court quoted from the opinion of the Supreme Court of the United States in Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425, as follows:

"The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law *as are personal dealings between a director and his corporation,* and where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration." (Emphasis added.)

The jury in the instant case was warranted in finding in effect that no amount was due J. Popperman at the time said notes were signed, either for money allegedly loaned or advanced by him to the Cemetery or for alleged unpaid salary, since the dealings which he had with the Corporation were in fact dealings with himself and a man cannot contract with himself; and for the further reason that the advancements which he allegedly made to the Corporation were actually made to himself and largely used for his own personal benefit.

■ We are of the opinion that there was some evidence of probative force in support of the jury findings hereinabove set out, and that the court properly entered judgment based thereon.

■ Appellants' next Point is directed to the alleged error of the court in admitting evidence of expenditures made in connection with the Cemetery after the capital stock was transferred to the Swilley heirs. Appellants contend that there was no pleading entitling appellees to an offset against appellants' claim. The trial court did not err in admitting such evidence. It was offered in rebuttal of appellants' evidence relative to improvements to the Cemetery allegedly made by Popperman. It was not offered as an offset against appellants' claim. Appellees asserted they owed appellants nothing.

■ We find no merit in appellants' Point with respect to testimony elicited from Mr. Hebert concerning the Corporation books. The witness was interrogated with respect to the Corporation making payments in excess of $3,700.00 upon the $25,000.00 note executed by Swirsky, which was not a Corporation obligation. Nor do we find any error in the admission of evidence elicited from Jamail relative to the transaction between Popperman and Swilley.

■ Appellants in their 7th Point of Error complain of appellees' cross-examination of their witness, J. Howard Williams. This witness was a certified public accountant who had examined the books of the Corporation at appellants' request for the purpose of ascertaining the alleged indebtedness of the Corporation to Popperman. On cross-examination he was interrogated with respect to numerous entries in the books of account. Appellees propounded this question: "If J. Popperman had advanced $10,000.00 to the Corporation and had used the money to pay his own debts, therefore, there wouldn't be any basis for any indebtedness?" Appellants' witness was an expert in the field of accounting. We find no reversible error in the court permitting such interrogation. What is said here applies also to appellants' Point 8.

■ In their Point 10 appellants complain of the admission in evidence of defendants' Exhibit No. 21, a letter by appellees' certified public accountant who audited the books of the Corporation, on the ground that appellees did not offer in evidence the particular records supporting the letter which item-

ized certain payments made either directly to J. Popperman or in payment of his personal obligations. The record shows that appellees offered in evidence all books of account kept by the Cemetery Corporation during the time that Popperman was in control of its operations, consisting of the receipts & disbursements journal and general ledger, and that the same were duly admitted and are now on file in this Court. There is no merit in appellants' assignment nor in their Point 11.

In the next Point appellants assert that there was error in permitting appellees to offer in evidence a statement made by appellants in their motion for summary judgment and that the mention of such motion before the jury was prejudicial. We do not agree. In all likelihood the jury had no conception of what a motion for summary judgment was. The jury was not informed as to the court's ruling on such motion. The portion of the motion in question was offered in cross-examination of appellants' witness Jamail.

We have carefully examined appellants' Points 13 to 18, inclusive, which in the main part involve complaints similar to those above described, and, finding no reversible error, overrule the same.

Appellants' Points of Error Nos. 19 to 23, inclusive, complain of the error of the trial court in the submission of the four Special Issues requested by appellees, asserting that such issues were not raised by the pleadings of appellees or by evidence properly admitted in support thereof. The findings to these Special Issues are set out hereinabove. It is our view that Special Issue No. 16 was properly submitted under the allegations in appellees' pleading and the evidence adduced at the trial. It, in effect, inquires if the directors in voting Popperman a salary of $——— intended that he should fix his own salary. The law is well settled that an officer of a corporation cannot recover of the corporation any salary or compensation for services ren-

dered, unless such salary or compensation was fixed in some authorized manner, before the performance of the services. Austin City R. R. Co. v. John M. Swisher, 1 White & Wilson, p. 33; 19 C.J.S. Corporations § 804, p. 192 et seq. J. Popperman, in answering questions with respect to the note given to him allegedly in payment of salary due by the Corporation, testified by deposition as follows:

"Q Was your salary fixed by the Board of Directors?

"A I don't know; you will have to look at the minutes; I do not have them.

"Q You don't know whether your salary was ever fixed or not?

"A No, sir."

Appellants also complain that Special Issue No. 17 was improperly worded because it inquired as to whether during the period from June 5, 1942 until June 17, 1948, Popperman devoted all his time to the conduct of the business of Resthaven Cemetery, Inc. The language employed in Special Issue No. 17 is taken directly from the minutes of the Corporation.

With respect to Special Issue No. 18, there was evidence from which the jury could have concluded that at the time the resolution was passed authorizing Howard Hebert, vice president, to execute the two notes in question, Louis R. Jamail had a personal financial interest in the passage of such resolution. Mr. Jamail testified that Mr. Popperman owed him $5,000.00; that he knew the Company didn't have any money; that he thought the only way Popperman could be assured of getting the money owed him by the Corporation was to get the notes executed; and that the only way Mr. Popperman could pay him (Jamail) was to get some money. When asked, "So as a natural consequence, wasn't it in your mind, or weren't you just as interested in his getting his money in order to pay you as you were interested for any other reason for

him getting his money?" he answered, "That could have been a part of it, but wasn't the main factor."

■ Special Issue No. 19 inquired as to whether Howard Hebert in performing the duties of a director of Resthaven Cemetery, Inc. did so under the direction and in the interest of J. Popperman. Mr. Hebert testified that before the two notes sued upon were executed he personally checked the books of the Corporation to determine that the amounts of the notes were correct. On cross-examination, however, Hebert admitted that he did not know of any indebtedness owing to W. S. Swilley. He testified that payments by the Corporation on the $25,000.00 stock purchase money note, were never shown to him and he knew nothing about it at all. He admitted that he made no real good examination, but relied upon an adding machine tape exhibited to him by the bookkeeper. He admitted that he had never before seen the ledger account showing payments by the Corporation of interest on the $25,000.00 purchase money note. He testified that if those accounts had come to his knowledge he didn't know whether he would or would not have concluded that the amount of the notes was correct. He owned no stock in the Corporation. Mr. Popperman asked him to become a director. He knew nothing about the stock ownership of the Corporation and apparently little about the Corporation's operations. From Mr. Hebert's testimony the jury might well have concluded that he performed his duties as a director under the direction and in the interest of J. Popperman. The jury might also have concluded that the notes in question were not authorized by a disinterested board of directors due to the financial interest of Jamail in the passage of such resolution.

Appellants complain of alleged misconduct on the part of the jury, asserting that the verdict returned was based on prejudice, ill-feeling, and contempt toward plaintiff. and plaintiff's counsel, and in disregard by the jury of the instructions given by the court. The evidence elicited during the hearing on the motion for new trial, reflects that one of the jurors, Pearl M. Kornbluh, became ill during the trial and was excused by agreement of both parties. The misconduct complained of consisted of her testimony that during the trial and prior to her being excused, another juror seated directly behind her leaned over and whispered to her, "Do you know anything about handwriting? I know all about handwriting and when we get in the deliberation room I am going to show you where those two signatures were by one person."

■ The record shows that Mrs. Kornbluh identified the juror who whispered in her ear as Mrs. Emma Lawrence, who is shown by stipulation to have been seated in the jury box, not behind the witness, but several seats removed from her in the same row. In view of the seating arrangement of the jury, the court might well have found that such alleged misconduct did not occur. The court ruled:

> "I shall rule the testimony of Mrs. Kornbluh does not show jury misconduct. * * * It shows mostly why she was feeling ill and why she asked me to excuse her, that she couldn't go further in the case, and that I shouldn't set aside the verdict on that or require the others to come in and testify."

Mrs. Kornbluh did not participate in the deliberations of the jury, and she is the only one who could have heard the whispered words. If such misconduct occurred, it was not such as was probably calculated to cause and probably did cause the rendition of an improper verdict or judgment. Rule 434, Texas Rules of Civil Procedure.

Judgment affirmed.

COLEMAN, J., not sitting.