**A. T. MANDRIL, Appellant,**

v.

**Coraldale KASISHKE, Appellee.**

No. 9268.

Court of Civil Appeals of Texas, Amarillo.

July 31, 1981.

Rehearing Denied Aug. 26, 1981.

Kolander & Hamilton, R. C. Hamilton, Amarillo, for appellant.

Whittenburg, Whittenburg & Schachter, George Whittenburg and David Mullin, Amarillo, for appellee.

DODSON, Justice.

A. T. Mandril brought this action against Coraldale Kasishke for alleged breaches of two contracts between the parties. In his action, Mr. Mandril alleged that Mrs. Kasishke overcharged him for gasoline and diesel fuel purchased under the agreements. Mrs. Kasishke generally denied Mr. Mandril's allegations and alleged several affirmative defenses such as voluntary payment, laches, estoppel, waiver, modification, breach of contract, setoff and voidness. The case was tried with a jury. Based on the jury's answers to certain special issues, the trial court rendered a take-nothing judgment on Mr. Mandril's cause of action against Mrs. Kasishke. Mr. Mandril appeals from the judgment. We reverse and render.

On 23 February 1970, a partnership consisting of Mr. Mandril and Roger Gruhlkey leased a service station from Mrs. Kasishke.[1] The station was designed and used as a truck stop and was known as "Texaco Truck Town." The lease agreement was for a term of five years beginning 1 March

---

1. Mr. Gruhlkey assigned his interest in the cause of action to Mr. Mandril and therefore is not a party to this action.

1970 and ending 28 February 1975.[2] The monthly rental for the premises was computed on a "cents-per-gallon-of-fuel-sold" basis with a minimum rental of $2,000 per month. In addition, the partnership agreed to purchase, and Mrs. Kasishke (or her nominee) agreed to supply, certain types of gasoline, kerosene and diesel fuel. The prices for these products were variable and, in one way or another, were tied to the "posted tank wagon price of" or the "amount of any increase posted by" the supplier of Mrs. Kasishke. The partnership also agreed (as a "covenant") to purchase all petroleum products, automobile parts and accessories, and merchandise from Mrs. Kasishke or her nominee to the exclusion of any other supplier. Finally, the parties agreed that, after the first year of the lease, either party may terminate the agreement with 180-days notice if the partnership failed to purchase an average of 150,000 gallons of fuel per month for any consecutive 12-month period.

On 28 February 1975, the parties executed a second lease agreement for the truck stop. This agreement was for a term of one year beginning 1 March 1975 and ending on the last day of February 1976. Again, the monthly rental was computed on a "cents-per-gallon-of-fuel-sold" basis with a minimum rental of $3,000 per month. The parties maintained the same, exclusive purchase arrangement as before. The prices for fuels were Mrs. Kasishke's prevailing price to her customers adjusted by any increases or decreases by Mrs. Kasishke's supplier. There was no minimum fuel sales requirement.

In response to special issues one, two and three, the jury found that Mrs. Kasishke overcharged Mr. Mandril a total amount of $22,403.89 for the sale of gasoline and diesel fuel under the agreements; in issues four and five, that Mr. Mandril voluntarily paid the invoices for gasoline and diesel fuel delivered to him, although he was convinced at the time he was being overcharged, but

that he did so without knowledge of all the material facts concerning the overcharges; and, in issue six, that through their course of dealings the parties did not modify or adjust the prices provided for in the 23 February 1970 agreement.

In issue seven, the jury found that Mr. Mandril or one of his agents, servants, or employees signed written invoices agreeing to pay the amounts charged for gasoline and diesel fuel delivered to him during the period in question; in issue eight, that by his conduct, Mr. Mandril did not waive any right he had to recover for the alleged overcharges; and, in issue nine, that Mr. Mandril failed to purchase from P–K Supply, Inc. (Mrs. Kasishke's nominee) all of his oils, washing compounds, automobile and truck parts and accessories, and other merchandise that P–K Supply, Inc. could have sold and delivered or could have caused to be sold and delivered during the period in question.

In issues ten and eleven, the jury found that Mr. Mandril unreasonably delayed bringing this lawsuit and that the unreasonable delay hindered Mrs. Kasishke in the defense of this lawsuit. In issues twelve and thirteen, the jury also found that by his conduct, Mr. Mandril led Mrs. Kasishke reasonably to believe that he would not insist upon strict performance under the 23 February 1970 contract and that she relied upon his conduct by continuing to provide gasoline and diesel to him.

Mr. Mandril brings fifteen points of error. By his first four points, he maintains that the trial court erroneously failed to disregard the jury's answers to special issues ten and eleven, i. e., the laches issues; that, as a matter of law, the defense of laches was never an issue in the case; and that the evidence is legally and factually insufficient to support the jury's answers to the laches issues.

■ The parties agree that laches is an affirmative defense and that two of the essential elements of laches are: (1) an

2. The lease was subsequently modified by two written addendums executed by the parties on 13 March 1972 and 15 August 1972, respective-

ly. All references to the 28 February 1970 lease include these modifications unless otherwise noted.

unreasonable delay by one having legal or equitable rights in asserting them; and (2) *a good faith change of position by another to his detriment because of the delay. City of Fort Worth v. Johnson*, 388 S.W.2d 400, 403 (Tex. 1964). The burden of proving the essential elements of laches is on the party asserting it, and the failure to prove any one or more of the elements is fatal. *Id.* Furthermore, Mr. Mandril filed his action within the applicable statute of limitations period. In *Barfield v. Howard M. Smith Co. of Amarillo*, 426 S.W.2d 834, 840 (Tex. 1968), the Court acknowledged and stated the following settled principle: "Generally in the absence of some element of estoppel or *such extraordinary circumstances as would render inequitable the enforcement of petitioners' right after a delay*, laches will not bar a suit short of the period set forth in the limitation statute." (Emphasis added).

In support of his position, Mr. Mandril, in essence, claims that the evidence is legally and factually insufficient to support a finding that Mrs. Kasishke made a good faith change of position to her detriment because of any delay by him in bringing this action. Conversely, Mrs. Kasishke contends that the record supports such a finding in that: (1) she was "lulled" into not exercising her right to terminate the agreement for his failure to purchase 150,000 gallons of fuel per month as a result of his continuing to order, receive and pay for fuels at the prices charged; (2) Mr. Mandril destroyed or materially hindered proof of a substantial counterclaim or setoff for lost profits; and (3) a material witness for Mrs. Kasishke died before the trial of this case.

■ The record shows that Mr. Mandril, more often than not, failed to meet the minimum purchase requirement of 150,000 gallons of fuel per month; that as early as 1973 he thought he was being overcharged; that he told Mrs. Kasishke that he was being overcharged; that she did not acknowledge any overcharges and told him he was being treated fairly; that she thought he was satisfied; and that she continually pushed him to increase his volume of fuel

sales. As stated in *Barfield*, 426 S.W.2d at 840: "As a party to arm's length business transactions, respondent had a duty to use ordinary care for the protection of its own interests . . . and [is] also charged with the legal effect of any instrument it signed." It is undisputed that Mrs. Kasishke negotiated and voluntarily entered into both the 1970 and 1975 lease agreements and that she knew she had the right under the 28 February 1970 agreement to terminate the lease for non-compliance with the 150,000-gallon volume requirement. In this connection, Mrs. Kasishke testified that she did not terminate the lease because she continually thought Mr. Mandril would increase the fuel sales volume. Therefore, it being undisputed that Mrs. Kasishke did not terminate the lease in the expectation that Mr. Mandril would increase the fuel sales volume, there is no evidence to show that she made a good faith change of position to her detriment because of any delay by Mr. Mandril in bringing this action.

■ Mrs. Kasishke further contends that she made a good faith change of position to her detriment because Mr. Mandril destroyed or materially hindered proof of her substantial counterclaim or setoff for lost profits. In this connection she argues that the contracts required Mr. Mandril to purchase "the gasoline, fuels, oils, greases, solvents, chemicals, kerosene, washing compounds, automobile parts and accessories, and other merchandise from Lessor [Mrs. Kasishke] or its [sic] nominee, to the exclusion of similar merchandise marketed or distributed by any other person, firm or corporation"; that Mr. Mandril failed to comply with this provision by purchasing such merchandise from third parties; and that, before and after he filed this lawsuit, Mr. Mandril destroyed or disposed of his invoices on such third party purchases.

Additionally, she claims a "change of position" because a material witness died after the lawsuit was filed. The alleged material witness was the general manager of Kasishke Texaco, which sold gasoline and diesel fuel to Mr. Mandril under the lease. Mr. Mandril dealt with the general mana-

ger of Kasishke Texaco during the course of his operation of the truck stop.

The record shows that Mr. Mandril customarily threw away invoices and other records three years after the April 15 federal income tax filing date. Until approximately three weeks before trial, Mrs. Kasishke never inquired of Mr. Mandril concerning the alleged third party invoices. This action was filed on 26 June 1978 and was tried on 4 March 1980. The record shows that the alleged material witness died several months after the lawsuit was filed but several months before the action was tried.

There is no evidence that Mrs. Kasishke made efforts to obtain the testimony of the alleged material witness after the lawsuit was filed. If the alleged material witness's testimony was important to her position, she is charged with the knowledge of its importance. Again, as stated in *Barfield*, 426 S.W.2d at 840: "As a party to arm's length business transactions, respondent had a duty to use ordinary care for the protection of its own interests and is charged with knowledge of all facts which would have been discovered by a reasonably prudent person similarly situated.... " Mrs. Kasishke's second and third contentions represent a change of conditions rather than a good faith change of position to her detriment because of any delay of Mr. Mandril in asserting his right to recover for the alleged overcharge.

Accordingly, we conclude that Mrs. Kasishke failed to establish a good faith change of position to her detriment because of any delay by Mr. Mandril in bringing his action. Therefore, we sustain points one, two and three.

In points of error five, six, seven and eight, Mr. Mandril maintains that the court erroneously failed to disregard the jury's answers to the estoppel issues, *i. e.*, special issues twelve and thirteen, that, as a matter of law, the defense of estoppel was never an issue in the case; and that the evidence is legally and factually insufficient to support the jury's answer to special issues twelve and thirteen. Under these points, Mr. Mandril, in essence, contends that the evidence is legally and factually insufficient to support findings on all of the essential elements of estoppel.

The essential elements of estoppel are: (1) a false representation or concealment of a material fact; (2) made with knowledge, actual or constructive, of the fact; (3) the party to whom it was made must be without knowledge or the means of knowing the real facts; (4) the false representation or concealment must have been made with the intention that it would be acted on; and (5) the party to whom it was made must have relied on and acted on it to his prejudice. *Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929, 932 (1952). The burden of proving each element of estoppel is upon the party asserting it and the failure to prove any one or more of the essential elements is fatal. *Barfield v. Howard M. Smith Co. of Amarillo*, 426 S.W.2d at 838.

In special issues twelve and thirteen, the jury found that Mr. Mandril led Mrs. Kasishke "reasonably to believe that he would not insist upon strict performance under the February 23, 1970 contract" and that Mrs. Kasishke "relied upon conduct of plaintiff [Mr. Mandril] ... by continuing to provide gasoline and diesel fuel to him." No other issues on estoppel were requested or submitted to the jury.

Given these circumstances, Mrs. Kasishke maintains, as we understand her position, that the conduct of Mr. Mandril upon which she relies was his continuing to order and pay for gasoline and diesel fuel at the prices charged. Nevertheless, one of the elements of estoppel which she had the burden to prove was, as stated above, that she was without knowledge or the means of knowing the real facts. It is undisputed that Mrs. Kasishke knew or had the means of ascertaining the correct contract price of gasoline and diesel fuel. We have not been referred to evidence to the contrary. It suffices to state without further discussion that she failed to establish one of the essential elements of her defense of estoppel. Therefore, we sustain points five, six and seven.

As stated above, in response to special issue number seven, the jury found that Mr. Mandril, or one of his agents, servants, or employees signed written invoices agreeing to pay the amounts charged for gasoline and diesel fuel delivered to him during the period in question. In points of error ten and eleven, Mr. Mandril maintains that the trial court erroneously failed to disregard the jury's answer to special issue seven, because the issue is immaterial and, as a matter of law, the signed invoices do not constitute contractual agreements to establish new prices for fuel or change or modify the contract prices for fuel stated in the lease agreements executed by the parties. In support of his position, he argues that the invoices do not constitute legal contracts.

Mrs. Kasishke, on the other hand, contends that the invoices constitute written modifications of the lease agreements which are binding on the parties. She claims that the sales of fuel are "goods" and that therefore Tex.Bus. & Com. Code Ann. chapter 2 (Vernon 1968) controls. In particular, Mrs. Kasishke relies upon § 2.209(a) of the code which says that an "agreement modifying a contract *within this chapter* [2] needs no consideration to be binding." She also relies on *Adams v. Can-Dee Oil Corp.*, 357 S.W.2d 808 (Tex.Civ.App. —Waco 1962 writ ref'd n.r.e.), to support her position that the signed, written invoices in this case modify the pricing terms in the agreements.

It is elementary that parties having the power to make a contract have the power to modify it. *Moser Co. v. Awalt Industrial Properties, Inc.*, 584 S.W.2d 902, 906 (Tex.Civ.App.—Amarillo 1979, no writ). However, the new or modifying agreement must possess the essential elements of a contract. In particular, there must be a meeting of the minds of the parties, *Southern Travelers' Ass'n v. Wright*, 34 S.W.2d 823, 826 (Tex. Comm'n App. 1931, holding app'd), and the terms of the original contract cannot be unilaterally remade by one of the parties. *Kitten v. Vaughn*, 397 S.W.2d 530, 533 (Tex.Civ.App.—Austin 1965, no writ).

In *Adams*, the plaintiff sued for commissions due under a written employment agreement which provided that he was to receive 2½¢ per gallon of gasoline sales as compensation for managing the defendant's service station. 357 S.W.2d at 808. However, certain "daily inventory balance sheets" signed by the plaintiff and furnished by him to the defendant showed his compensation rate to be from 1¢ to 2¢ on certain days. *Id.* The court determined that the balance sheets constituted agreements modifying the employment agreement; and, because they were in writing, the court held that the writings imported consideration. *Id.* Nevertheless, Adams is distinguished from the case before us by several important considerations.

The balance sheets in *Adams* differentiated and specified the lower compensation rate to be paid to the complaining party. Our examination of the invoices in question reveals that they contain none of the attributes of a legal contract. They amount to no more than an acknowledgement by Mr. Mandril that he "Rec'd Merchandise in Good Order." The invoices contain no agreement to pay the stated prices for fuel or other merchandise. They make no reference to a change or modification of the written contract price for fuel. There is no information on the invoices showing, indicating or revealing that the stated prices for fuel are greater than or deviate from the agreed contractual prices stated in the lease agreements. Furthermore, there is no evidence in the record that the invoices were presented to Mr. Mandril as a new contract for, or a modification or change of, the fuel prices stated in the lease agreements executed by the parties. Thus, under the circumstances, the invoices do not constitute contracts for a change of the fuel prices stated in the written lease agreements executed by the parties. Accordingly, the trial court erroneously failed to disregard the jury's answer to special issue number seven.

As previously stated, in response to special issue number nine, the jury found that

Mr. Mandril failed to purchase from P–K Supply, Inc. all his oils, washing compounds, automobile and truck parts and accessories, and other merchandise that P–K Supply, Inc. could have sold and delivered or could have caused to be sold and delivered during the period in question. By this answer, the jury found that Mr. Mandril failed to comply with the exclusive purchase provisions of the contract. In his thirteenth and fourteenth points of error, Mr. Mandril maintains that the trial court erroneously failed to disregard the jury's answer to special issue number nine because his failure to comply with the exclusive purchase provision of the contracts in question does not preclude his recovery for the overcharges found by the jury in response to special issues one, two and three.

Mrs. Kasishke relies on the general statement that a breach of an agreement by one contracting party excuses performance by the other. *See Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 689 (Tex.1981); *Morgan v. Singley*, 560 S.W.2d 746, 749 (Tex. Civ.App.—Texarkana 1977, no writ). However, under the circumstances before us, the statement is too broad for controlling application. The applicable, controlling principle is stated in *Sinclair Refining Co. v. Costin*, 116 S.W.2d 894, 898 (Tex.Civ.App.—Eastland 1938, no writ), as follows:

> 'Where there has been a material breach which does not indicate an intention to repudiate the remainder of the contract, the injured party has a genuine election either of continuing performance or of ceasing to perform. Any act indicating an intent to continue will operate as a conclusive election, *not indeed depriving him of a right of action for the breach which has already taken place*, but depriving him of any excuse for ceasing performance on his own part.' (Emphasis theirs). (Citation omitted).

*See also Houston Belt & Terminal Ry. Co. v. J. Weingarten, Inc.*, 421 S.W.2d 431, 435

(Tex.Civ.App.—Houston [1st Dist.] 1967, writ ref'd n. r. e.).

The evidence shows that Mrs. Kasishke was president of, and owned 75% of the stock of, P–K Supply, Inc.; that she knew or should have known from the sales of P–K Supply, Inc. that Mr. Mandril was not complying with the exclusive purchase provision of the lease agreement; and that she continued to operate under the lease agreement. Under these circumstances, we conclude that Mr. Mandril's non-compliance with the exclusive purchase provision does not preclude his recovery for the fuel overcharges found by the jury in special issues one, two and three. Accordingly, we sustain the thirteenth and fourteenth points of error.

In his fifteenth point of error, Mr. Mandril contends that the trial court erred in failing to render a judgment in his favor for $22,403.88 which the jury determined to be the amount of overcharges by Mrs. Kasishke. Furthermore, he claims to be entitled to prejudgment interest at the statutory rate of six percent per annum, Tex.Rev. Civ.Stat.Ann. art. 5069–1.03 (Vernon Supp. 1980–1981), in the amount of $6,905.69.[3]

In support of his claim for prejudgment interest, Mr. Mandril relies on *Phillips Petroleum Co. v. Stahl Petroleum Co.*, 569 S.W.2d 480 (Tex.1978). In that case, the Supreme Court of Texas held that prejudgment interest was recoverable on "written contracts ascertaining the sum payable, from and after the time when the sum is due and payable [*quoting* Tex.Rev.Civ.Stat. Ann. art. 5069–1.03, 1967 Tex.Gen.Laws, ch. 274, § 2, at 609] . . . ." *Id.* at 483. Additionally, the Court acknowledged and confirmed the previously questioned, equitable doctrine for use and detention of money. *Id.* at 485–88. The equity principle, simply stated, is that one who wrongfully detains and uses someone else's money should have to pay interest for its use. *Id.*

---

**3.** In his brief, Mr. Mandril computed the interest on the overcharges under the first agreement from the termination date, 28 February 1975, to the date the judgment was entered, 29 May 1980, rather than on a month-to-month, cumulative basis. He did the same for the second agreement, which terminated on 29 February 1976.

■ In this case, the record shows (and the jury found) that Mrs. Kasishke wrongfully overcharged Mr. Mandril for certain delivered fuels, the prices of which were clearly ascertainable, that he paid her the amount of the overcharges, and that she failed to reimburse him for the overcharged amount. Furthermore, it is undisputed that she has had the use and benefit of the overcharged amount. Accordingly, we sustain Mr. Mandril's claim for prejudgment interest.

■ In her ninth reply point, Mrs. Kasishke maintains that the jury's answer to special issue number four establishes a legal defense to Mr. Mandril's action and supports the trial court's take-nothing judgment. We disagree. In special issue number four, the jury found that Mr. Mandril "voluntarily paid the invoices for gasoline and diesel fuel delivered to him during the period in question even though he was convinced at the time he was being overcharged." However, in response to special issue number five, the jury refused to find "that at the time Plaintiff, A. T. Mandril, paid the invoices for gasoline and diesel fuel during the period in question he had knowledge [*sic*] of all material facts concerning overcharges, if any."

In support of her position, Mrs. Kasishke relies on *Runcie v. Runcie*, 407 S.W.2d 861 (Tex.Civ.App.—Amarillo 1966, writ ref'd n. r. e.), which states:

It has been well established in this state that money voluntarily paid *with full knowledge of all the facts* and without fraud, deception, duress or coercion cannot be received back although it was paid upon a void or illegal demand or upon a claim which had no foundation in fact and was paid without consideration. *Pennell v. United Ins. Co.*, 150 Tex. 541, 243 S.W.2d 572; *Burnett v. Masonic Grand Chap. of Order of East. Star*, Tex. Civ.App., 369 S.W.2d 513; *American Casualty And Life Insurance Co. v. Boyd*, Tex.Civ.App., 394 S.W.2d 685 and the many cases cited in each of these cases. (Emphasis added).

*Id.* at 863; *accord, R. G. McClung Cotton Co. v. Cotton Concentration Co.*, 479 S.W.2d 733, 743 (Tex.Civ.App.—Dallas 1972, writ ref'd n. r. e.); *Brock v. Anderson-Prichard Oil Corp.*, 135 F.Supp. 579, 582 (W.D.Okla. 1955).

Under *Runcie*, one of the essential elements of the voluntary payment defense is payment with full knowledge of all the material facts. Given the jury's response to special issue number five, Mrs. Kasishke failed to establish this essential element. By cross-point, Mrs. Kasishke does not challenge the jury's response to special issue number five. Accordingly, we overrule this contention.

■ In her tenth reply point, Mrs. Kasishke contends that the trial court correctly rendered judgment for her because the contracts sued upon by Mr. Mandril are void and unenforceable under Tex.Bus. & Com. Code Ann. § 15.04 (Vernon 1968). Section 15.04 provides:

(a) Every monopoly, trust, and conspiracy in restraint of trade, as defined in Sections 15.01, 15.02, and *15.03* of this code, respectively, is illegal and prohibited.

(b) An agreement violating the prohibition against a monopoly, trust, or conspiracy in restraint of trade contained in Subsection (a) of this section is void and unenforceable in law or equity. (Emphasis added).

In pertinent part, section 15.03 provides:

(a) It is a conspiracy in restraint of trade for

(1) two or more persons engaged in buying or selling tangible personal property to agree not to buy from or sell to another person tangible personal property;

Mrs. Kasishke maintains that both of the contracts between the parties fall within the definition of "conspiracy in restraint of trade" because they provide that Mr. Mandril would purchase "gasoline, fuels, oils, greases, solvents, chemicals, kerosene, washing compounds, automobile parts and accessories, and other merchandise" from her or her nominee "to the exclusion of

similar merchandise marketed by any other person, firm or corporation."

In support of her position, Mrs. Kasishke relies on the general rule that courts will not enforce an illegal contract. *See generally Vann v. Toby*, 260 S.W.2d 114 (Tex.Civ. App.—Dallas 1953, writ ref'd n. r. e.); *see also* 13 Tex.Jur.2d *Contracts* § 202, pp. 414–15 (1960), and the cases cited therein. However, there are exceptions to the general rule which are applicable in this instance. As stated in *City of Galveston v. O'Mara*, 146 S.W.2d 416, 420 (Tex.Civ.App.—Galveston 1940), aff'd, 138 Tex. 16, 155 S.W.2d 912:

> It is the rule, however, that if a party can show a complete cause of action without being obliged to prove his own illegal act, although said illegal act may appear incidentally and may be important in explanation of other facts in the case, he may recover.

A further exception is stated in *Hunt v. Turner*, 9 Tex. 385, 389 (1853), as follows:

> Again: the rule is well established that a party to an illegal contract will not be permitted to avail himself of its illegality until he restores to the other party all that had been received from him on such illegal contract; that so long as he continues to hold on to enjoy the advantages of the contract he shall not be allowed to set up to his advantage its nullity.

This exception applies when the contract has been executed and has terminated by its own terms.

In this instance, it is undisputed that the contracts in question are executed and that they have terminated by their own terms. Assuming, *arguendo*, that the exclusive purchase provision is illegal, the proof of Mr. Mandril's cause of action is not grounded on the alleged illegal provision. Mrs. Kasishke argues, in effect, that she is entitled to retain all of the benefits which have accrued to her under the alleged illegal contracts and at the same time escape liability for her wrongful acts of overcharging for the fuel sold under the agreements. Under the circumstances before us, we disagree. Accordingly, Mrs. Kasishke's conten-

tions under the tenth reply point are overruled.

Mrs. Kasishke raises two "protective cross points" in her brief. In the first, she contends that, if we reverse the judgment of the trial court, then the cause should be remanded for a new trial because of improper sidebar remarks made by counsel for Mr. Mandril in front of the jury during the course of the trial. Under Tex. R.Civ.P. 269, the trial court is directed to rigidly suppress any sidebar remarks. By virtue of this rule, control of counsel during a trial must rest within the sound discretion of the trial court and it is uniformly held that a reviewing court will not interfere unless it is clear that the trial court abused its discretion in this regard. *In re Dahl*, 590 S.W.2d 191, 199 (Tex.Civ.App.—Amarillo 1979, writ ref'd n. r. e.). Furthermore, before we can reverse the judgment because of sidebar remarks, it must appear that they were improper and we must be satisfied that they were reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Aultman v. Dallas Railway & Terminal Co.*, 152 Tex. 509, 260 S.W.2d 596, 599 (1953).

In this instance, the record shows that counsel for Mrs. Kasishke objected to the sidebar remarks made by Mr. Mandril's attorney and that the trial court instructed the jury to disregard them. We do not detail each of the alleged improprieties. Nevertheless, we have carefully examined and considered each of them in light of the attending circumstances and the record as a whole and conclude that the remarks were not so grave and so fundamentally destructive to the merits of the case as to require reversal. *See Texas v. Baker*, 565 S.W.2d 77, 78 (Tex.Civ.App.—Amarillo 1977), *rev'd on other grounds*, 574 S.W.2d 63 (Tex.1978). Accordingly, we overrule Mrs. Kasishke's first cross-point.

In her second cross-point, Mrs. Kasishke contends that, if we should reverse the judgment of the trial court, then the cause should be remanded for a new trial because the trial court erroneously admitted sum-

maries of documents into evidence. For purchases under the first contract, these summaries show dates of fuel purchases, types of fuel purchases, gallons purchased, and the invoice prices per gallon. All of this information is summarized from voluminous invoices recording delivery of fuels to Mr. Mandril from P–K Supply, Inc. which were admitted into evidence. The summaries also provided Texaco, Inc.'s "Retailer Tank Wagon Price" on the dates of the sales. This information was taken from Texaco's "Selling Schedules" for P–K Supply, Inc. which were admitted into evidence. Finally, the amounts of overcharges were computed on a "cents-per-gallon" and "total overcharge" basis and placed in the summaries.

The summaries for purchases under the second agreement contain the same information derived from the invoices. They then compare the increases and decreases in P–K Supply, Inc.'s prices with the increases and decreases in Mr. Mandril's prices per gallon. From this information, a "cents-per-gallon" and a "total" overcharge was computed for each delivery date based upon the contractual rate. The summaries for each of the contracts were prepared by Mr. Mandril.

█ Mrs. Kasishke contends that the summaries should not have been admitted for two reasons. First, she maintains that Mr. Mandril is not competent to prepare the summaries because he is not a "qualified accountant." She relies on *Upjohn Co. v. Petro Chemical Suppliers, Inc.*, 537 S.W.2d 337, 339 (Tex.Civ.App.—Beaumont 1976, writ ref'd n. r. e.); *Schultz v. Resthaven Cemetery, Inc.*, 375 S.W.2d 493, 499–500 (Tex.Civ.App.—Houston [1st Dist.] 1964, writ ref'd n. r. e.); *Hartford Accident and Indemnity Co. v. Frazier*, 362 S.W.2d 417, 418 (Tex.Civ.App.—Waco 1962, writ ref'd n. r. e.); and *Bouknight v. Langdeau*, 333 S.W.2d 670, 674 (Tex.Civ.App.—Austin 1959), *aff'd*, 162 Tex. 42, 344 S.W.2d 435 (1961), for the proposition that Texas courts require summaries such as these to be prepared by qualified accountants. We disagree. Although each of these cases hold

that summaries of books or records prepared by accountants or auditors are admissible, none *require* such summaries to be prepared by "qualified accountants." Moreover, Mrs. Kasishke failed to object to the summary contained in plaintiff's exhibit number nine in the trial court on the ground that Mr. Mandril was not qualified to prepare it. Nevertheless, the record shows that Mr. Mandril has over 30 years of bookkeeping experience. We therefore conclude that the trial court did not err in admitting the summaries because Mr. Mandril was not an accountant.

Mrs. Kasishke also maintains that the trial court erred in admitting the summaries because they contain opinions and conclusions regarding the agreements which invade the province of the jury in four respects: (1) they assume that Texaco, Inc. was Mrs. Kasishke's "supplier" under the agreements, whereas she contended that her supplier was P–K Supply, Inc.; (2) they assume that the "posted tank wagon price" under the agreements means Texaco Inc.'s "Retailer's Tank Wagon Price" (higher) as opposed to its "Distributor's Tank Wagon Price" (lower); (3) they assume that Mrs. Kasishke was not entitled to charge Mr. Mandril 1½¢ per gallon for small deliveries as per the agreement; and (4) they assume that under the contract, Mr. Mandril was entitled to any decreases Mrs. Kasishke received from her supplier. She contends that each of these assumptions invaded the province of the jury.

█ After reviewing the record, we find that the summaries merely set forth information from other documents and records which were admitted into evidence. Trial courts have wide discretion in determining whether summaries are necessary to expedite the trial. *Black Lake Pipe Line Co. v. Union Construction Co.*, 538 S.W.2d 80, 93 (Tex.1976). Summaries are admissible if the underlying records are voluminous, admissible and made available to the opposing party. *Id.* at 93–94; *Jones v. Mendez*, 590 S.W.2d 826, 828 (Tex.Civ.App.—Houston [14th Dist.] 1979, no writ). Here, the invoices and selling schedules

which make up the summary are voluminous and were properly admitted into evidence. Thus, they were available for Mrs. Kasishke and her counsel to peruse and use for cross-examination.

 Portions of the summaries include amounts listed as "Overcharges on Cents Per Gallon," "Overcharges Per Gallon," "Overcharge in Dollars," or "Total Dollars Overcharge." Clearly, the amount of overcharges, if any, was an ultimate issue in the case. In her brief, under this cross-point, Mrs. Kasishke further says: "They [the summaries] invaded the province of the judge and the jury by saying to the jury, in effect, 'this is the proper legal interpretation of the contract, this is the proper measure of damages, and this is the amount of the damages.'" In this connection, we acknowledge that the rules permitting the introduction of summaries do not authorize the admission of conclusions as to the legal effect or consequences of the underlying records. *Hartford Accident and Indemnity Co. v. Frazier*, 362 S.W.2d 417, 418 (Tex.Civ. App.—Waco 1962, writ ref'd n. r. e.). In our view, however, the summaries present no more than Mr. Mandril's stated and asserted position under the records rather than conclusions as to the legal effect or consequences of the records. Nevertheless, assuming, *arguendo*, that the trial court erred in admitting the portions of the summaries which set forth amounts as "overcharges" we conclude that the error was harmless. Tex.R.Civ.P. 434.

Under Rule 434, for the error complained of to be harmful the error must be one reasonably calculated to and one which probably did cause the jury to render an improper verdict. The total overcharges in the summaries are $31,234.02. The jury found the amount of the overcharges to be $22,403.89, which is $8,830.13 less than the amounts set forth in the summaries. Thus, it is apparent from the record that the jury disregarded the summaries, based its award on other evidence in the record, and drew its own conclusions from the evidence. *See Roth v. Law*, 579 S.W.2d 949, 959 (Tex.Civ. App.—Corpus Christi 1979, writ ref'd n. r.

e.). Furthermore, the admission of incompetent evidence does not constitute reversible error when there is other competent evidence in the record on the same question. *Aerial Sprayers, Inc. v. King*, 317 S.W.2d 602, 606 (Tex.Civ.App.—Amarillo 1958, no writ). In this instance, there is other evidence in the record to support the jury's award, such as the lease agreements themselves, the actual invoices and Texaco's "Selling Schedules" which set forth both the "retailer" and the "distributor" tank wagon prices for the period in question. Accordingly, we overrule Mrs. Kasishke's second cross-point.

In summary, we sustain all of Mr. Mandril's points of error except points four, eight, nine and twelve, which, being immaterial to our decision, are not addressed. We overrule Mrs. Kasishke's two cross-points. We reverse the judgment of the trial court and render judgment that A. T. Mandril have and recover from Coraldale Kasishke the amount of $22,403.89, plus prejudgment interest in the unchallenged amount of $6,905.69 for the period ending on 29 May 1980 (the day the trial court rendered judgment), plus interest on both of such amounts at the rate of nine (9) percent per annum from 29 May 1980 until paid, and his costs.