IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-06-00005-CR

 

Edgar Perez Hernandez,

                                                                      Appellant

 v.

 

The State of Texas,

                                                                      Appellee

 

 

 



From the 12th District Court

Walker County, Texas

Trial Court No. 21723

 



MEMORANDUM  Opinion



 








          Appellant’s trial counsel filed a
notice of appeal in the above cause on November 30, 2005, fifty-five days after
imposition of sentence.  The court appointed appellate counsel twenty-one days
later.  Newly-appointed appellate counsel filed a notice of appeal on January
10, 2006[1]
and an extension request with this Court on January 23.

          Appellant’s original notice of appeal
is untimely.  See Tex. R. App. P.
26.2(a)(1); Slaton
v. State, 981
S.W.2d 208, 210 (Tex. Crim. App. 1998); Fowler v. State, 16 S.W.3d 426,
428 (Tex. App.CWaco
2000, pet. ref=d). 
Appellant’s motion for an extension of time to file the notice of appeal is
untimely.  See Tex. R. App. P. 26.3(b).

          Accordingly, the motion is
denied, and the appeal is dismissed for want of jurisdiction.  See Slaton,
981 S.W.2d at 210; Fowler, 16 S.W.3d at 428.

PER CURIAM

 

Before Chief Justice
Gray,

Justice
Vance, and

Justice
Reyna

Appeal dismissed

Opinion delivered and
filed February 15, 2006

Do not publish

[CR25]









[1]
          Newly-appointed counsel also
filed an untimely motion for new trial on January 10, 2006.








160;                                         
                                                                                                         
O P I N I O N
                                                                                                                

      This is an employment dispute. John Fox, a professor at Baylor University whose tenure was
threatened, first sued one of the witnesses against him for defamation. After his employment was
terminated, he also sued Baylor for defamation and added a claim for breach of contract, asserting
that Baylor did not properly follow its termination procedures. 
      Several witnesses in Fox’s jury trial testified that, while on a university-sponsored summer
field trip in 1996 to an anthropological site in Guatemala, he—often while under the influence of
alcohol—on numerous occasions initiated inappropriate and uninvited physical contact of a sexual
nature with female students and also made crude sexual comments to them. One student on the
trip, Shannon Mackay, reported the alleged incidents to the administration of Baylor where Fox,
a tenured professor in the anthropology department, had been employed for twenty years. Baylor
conducted an investigation and decided that the allegations against Fox were true. Before
beginning termination proceedings, however, Baylor offered to continue Fox’s employment if he
would accept sanctions in the form of a demotion, a written apology, counseling, and dismissal
of a defamation lawsuit he had filed against one of the complaining students. Fox refused. The
matter was referred to the Faculty Tenure Committee (“Tenure Committee”) which decided that
the evidence warranted a termination hearing. Later, after a three-day hearing, the Tenure
Committee recommended to Baylor’s President that Fox’s employment be terminated; the
President concurred, and Fox was discharged.
      Earlier, when Fox learned that Baylor was conducting an investigation, he sued one of the
witnesses against him, Judy Parker, for defamation on the basis that her statements to Baylor made
during the investigation were untrue. After his termination, Fox joined Baylor as a defendant,
alleging breach of his employment contract: he claimed that the investigation and hearing had not
been conducted according to procedures contained in Baylor’s personnel policies which were part
of his employment contract. He also alleged that Baylor had defamed him by its actions which
led to information about the termination proceedings being disclosed to the public. In addition,
he added an allegation that Parker defamed him by making false statements during the termination
hearing. After a four-week trial, a jury returned its verdict, finding:
      •    Baylor failed to comply with its contract with Fox.
      •    Fox did not “waive” Baylor’s obligations under the contract.
      •    Fox’s damages were $153,788 for lost wages and employment benefits in the past and
in the future.
 
      •    Baylor did not make defamatory statements about Fox.
      •    Parker did not make defamatory statements about Fox.
The court rendered judgment for Fox and against Baylor for contract damages in the amount of
$153,788 plus $32,295.48 in pre-judgment interest.
      Fox appeals on twenty-one issues, complaining inter alia that the amount of damages the jury
awarded was inadequate. In three cross-issues, Baylor asserts the evidence is legally insufficient
to support the jury’s finding that Baylor did not comply with the terms of the employment
contract. Based on our analysis of Baylor’s cross-issues, we will reverse the judgment and render
a take-nothing judgment against Fox. Because of that, we do not reach many of his issues.
I. BAYLOR’S LEGAL-SUFFICIENCY ISSUES
      Fox alleged that Baylor breached the employment contract by failing to comply with
procedures—all part of his employment contract—in three areas. He says: (1) procedures setting
forth the mechanism for termination of a tenured professor were either not followed or
inadequately followed; (2) procedures setting forth the method of investigating allegations of
sexual harassment were not followed; and (3) procedures on employee confidentiality were not
followed. The court submitted a single jury question without any instructions: “Did Baylor
University fail to comply with its employment contract prior to terminating John Fox’s
employment with Baylor?”
      Baylor’s complaint rests on this reasoning: 
      •    Fox’s employment contract is unambiguous as to procedures which apply to terminations.
 
      •    Many of the procedures relied on by Fox are not ones to which Baylor was bound.
 
      •    The evidence shows that the procedures which do apply were thoroughly followed. 
 
      •    Therefore, there is no evidence to support the jury’s finding that Baylor did not comply
with the employment contract. 

A. Standards of Review
Legal sufficiency of the evidence
      When the party complaining of legal insufficiency did not have the burden of proof at trial,
we conduct our review by considering only that evidence and the inferences therefrom which
support the finding, considered in the light most favorable to the finding, and disregarding
contrary evidence and inferences. Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex.
1995); Holt Atherton Industries, Inc. v. Heine, 835 S.W.2d 80, 84 (Tex. 1992). We can find the
evidence legally insufficient if: (1) there is a complete absence of evidence for the finding, (2)
there is evidence to support the finding, but rules of law or evidence bar the court from giving any
weight to the evidence, (3) there is no more than a mere scintilla of evidence to support the
finding, or (4) the evidence conclusively establishes the opposite of the finding. Merrell Dow
Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997) (citing Robert W. Calvert, “No
Evidence” and “Insufficient Evidence” Points of Error, 38 Tex. L. Rev. 361, 362-63 (1960));
Juliette Fowler Homes, Inc. v. Welch Assoc., Inc., 793 S.W.2d 660, 666 n.9 (Tex. 1990). “More
than a scintilla of evidence exists where the evidence supporting the finding, as a whole, ‘rises to
a level that would enable reasonable and fair-minded people to differ in their conclusions.’” 
Burroughs Wellcome, 907 S.W.2d at 499 (quoting Transportation Ins. Co. v. Moriel, 879 S.W.2d
10, 25 (Tex. 1994)). If the evidence is so weak as to do no more than create a mere surmise or
suspicion of the finding’s existence, the effect is that there is legally-insufficient evidence. Haynes
& Boone v. Bowser Bouldin, Ltd., 896 S.W.2d 179, 182 (Tex. 1995).
Construing a contract
      Whether a contract is ambiguous is a question of law for the court. Heritage Resources, Inc.
v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996). If a contract is not ambiguous, the rights and
obligations under the agreement are also determined as a matter of law. ACS Investors, Inc. v.
McLaughlin, 943 S.W.2d 426, 430 (Tex. 1997). Therefore, we review these issues de novo.
      An unambiguous contract is construed according to the plain meaning of its express wording. 
Lyons v. Montgomery, 701 S.W.2d 641, 643 (Tex. 1985); Kahn v. Seely, 980 S.W.2d 794, 797
(Tex. App.—San Antonio 1998, pet. denied). But the court must “look[] at the contract as a
whole in light of the circumstances present when the contract was entered.” Nat. Union Fire Ins.
v. CBI Industries, 907 S.W.2d 517, 520 (Tex. 1995). Each part of the contract is considered
against all other parts to determine its meaning, and there is a presumption that the parties intended
every part to have some effect. Heritage Resources, 939 S.W.2d at 121. Terms used in the
contract have their “plain, ordinary, and generally accepted meaning unless the [contract] shows
that the parties used them in a technical or different sense.” Id. Unambiguous contracts are
enforced as written. Id.



      But if the express wording is subject to two or more reasonable interpretations, the contract
is ambiguous. CBI Industries, 907 S.W.2d at 520; Coker v. Coker, 650 S.W.2d 391, 393 (Tex.
1993). “Patent” ambiguities are those which are apparent from the face of the contract. CBI
Industries, 907 S.W.2d at 520. “Latent” ambiguities arise when an apparently unambiguous
contract is applied to its subject matter and an ambiguity appears. Id. If the court finds that a
contract is ambiguous, either patently or latently, the goal then is to determine the true intentions
of the parties, for that will resolve the ambiguity. Id.; Coker, 650 S.W.2d at 393; Kahn, 980
S.W.2d at 797. This determination involves fact issues. Columbia Gas Trans. Corp. v. New Ulm
Gas, 940 S.W.2d 587, 589 (Tex. 1996) (citing Universal C.I.T. Credit Corp. v. Daniel, 150 Tex.
513, 243 S.W.2d 154, 157 (1951)). Parol evidence may be introduced to discern the parties’
intent. CBI Industries, 907 S.W.2d at 520. In a jury trial, the resolution of the parties’ intent is
assigned to the jury. See Sage Street Associates v. Northdale Const. Co., 863 S.W.2d 438, 445
(Tex. 1993); John Wood Group USA, Inc. v. ICO, Inc., 26 S.W.3d 12, 16 (Tex. App.—Houston
[1st Dist.] 2000, pet. denied).
B. Termination Procedures
      Most of the evidence at trial pertained to termination procedures. The parties vigorously
contested which ones applied and whether those were followed.
Procedures asserted by Fox
      Fox was granted tenure in 1983. At that time, and thereafter, there were written procedures
for terminating a tenured professor. The parties agree that these were incorporated into Fox’s
employment contract. One of these is policy 704, which in 1983 stated that a tenured faculty
member cannot be terminated “unless adequate cause for dismissal is demonstrated in a fair
hearing, following established procedures of due process.” Another policy applicable is 705
which sets out in considerable detail the procedures that must be followed before a tenured
professor can be terminated. They include:
      •    A written “charge” containing allegations supporting dismissal is prepared by a
designated administrator.
 
      •    The charge is filed with the Tenure Committee which sends a copy of it to the professor
and requests an answer.
 
      •    The Tenure Committee reviews the charge and answer and decides whether there is
“probable cause” to proceed to a dismissal hearing.
 
      •    The professor can challenge for cause the composition of the Tenure Committee, from
which members of the professor’s department are automatically excluded.
 
      •    At the hearing, “substantial evidence” to support termination must be submitted, and the
professor may then challenge the evidence and present contradictory evidence. Witnesses
are usually presented in person unless not reasonably available, in which event sworn
statements may be submitted. Witnesses can be cross-examined. 
 
      •    After the hearing, the Tenure Committee makes written findings and a recommendation,
which are sent to the President of Baylor for a final decision. Absent serious procedural
errors, the President accepts the Committee’s findings. But the President has discretion
about whether to follow a recommendation to terminate the professor.
 
      •    The Board of Regents of Baylor may review the President’s decision.
      With one exception (see “5" below), Fox admits that policies 704 and 705 “remained
essentially unchanged from the time that Fox’s tenure rights vested in 1984 [sic] until June 1997,
when . . . [the President] . . . unilaterally amended [705]” and issued additional guidelines for
termination hearings. (Response Brief of Appellant/Cross Appellee p. 6). At trial, Fox
alleged (1) inadequate application of procedures in policy 705, and (2) generally, a violation of
policy 704's right to a “fair hearing, following established procedures of due process.”



Specifically, Fox alleged:
      1.   Baylor failed to inform Fox early on that it was conducting an investigation. 
 
      2.   Baylor failed to install an elected faculty committee to handle the matter instead of the
Tenure Committee.
 
      3.   The charge filed with the Tenure Committee failed to explicitly state the grounds for
dismissal in a way that referenced policy 705.
 
      4.   Baylor failed to obtain exculpatory evidence unavailable to Fox.
 
      5.   Baylor’s President forced on Fox’s Tenure Committee new guidelines for conducting the
hearing which were prejudicial to Fox.



 
      6.   The findings and recommendation from the Tenure Committee were prepared by Baylor’s
attorney, which prevented the Tenure Committee from “presenting a reasoned report.”
 
      7.   Baylor provided material benefits—legal counsel—to student witnesses it called at the
hearing.
 
      8.   In its decision to proceed to a hearing, Baylor required the Tenure Committee to accept
as true the hearsay allegations of a single witness.
 
      9.   One of Baylor’s attorneys presided at the hearing, skewing the evidentiary rulings in
Baylor’s favor.
 
      10. The President never reviewed a transcript of the hearing.
 
      11. Baylor did not provide the Board of Regents with a transcript of the hearing.

      In addition to violations of policies 704 and 705, Fox alleged that Baylor had violated forty-year-old termination procedures of the American Association of University Professors (“AAUP”). 
Specifically, Fox alleged that violations 1, 2, 3, and 6 above were also violations of the AAUP
procedures. Fox argued that, in 1940, the AAUP and the Association of American Colleges
adopted a “Statement of Principles on Academic Freedom and Tenure” (the 1940 statement). In
1958, the organizations adopted a “Statement of Procedural Standards in Faculty Dismissal
Proceedings” (the 1958 statement). Fox asserts that because Baylor’s policy 701—a policy
pertaining to “Academic Freedom”—quotes from part of the 1940 statement dealing with academic
freedom, Baylor thereby adopted the 1958 statement and its procedures. 
      In summary, we must decide: (1) Was the contract ambiguous?; (2) If not, what procedures
was Baylor contractually obligated to follow?; and (3) Was the evidence legally sufficient to prove
that Baylor failed to comply with any of those procedures?
Applicable procedures
      The court refused Baylor’s request to find that the contract is unambiguous as a matter of law
and to instruct the jury that policy 705 was the controlling agreement regarding termination
procedures. Baylor argues that if the contract is unambiguous and only the procedures in 705 are
applied, then all of Fox’s evidence about how the contract should be interpreted and about other
procedures is not probative. It further points to Fox’s expert’s testimony that Baylor complied
with the procedures in 705 and to other evidence about what procedures were followed, and to
what extent. On that basis, Baylor says we should find that the evidence is legally insufficient to
support the jury’s finding of non-compliance with the contract.
      It is undisputed that Fox’s employment was extended annually. In April 1996, Baylor’s
President sent Fox a letter for the upcoming 1996-97 school year. The letter did not refer to the
summer term. It stated, in part, “If you accept this letter of appointment, your complete contract
with Baylor consists of this letter of appointment and the applicable provisions of the Baylor
University Personnel Policy Manual, which Baylor may change from time to time.” Fox signed
the signatory line at the bottom of the letter which referred to the following statement: “I accept
this appointment, am ready, willing and able to perform my duties, and agree to abide by the terms
of this letter of appointment.” Similar letters had been sent each year extending Fox’s contract. 
Accordingly, we find no ambiguity in the April 1996 letter that the applicable procedures are to
be found in Baylor’s Personnel Policy Manual. Heritage Resources, 939 S.W.2d at 121; Lyons,
701 S.W.2d at 643.
      As for Fox’s argument about the 1958 statement, we find no support, either in the express
language of policy 701, in the evidence, under any applicable legal principle, or logically, that
by quoting in 701 from the 1940 statement on academic freedom, Baylor intended to incorporate
the 1958 statement or its procedures for termination into Baylor’s policies. In addition, Fox’s own
expert testified that Baylor had not adopted the 1958 procedures for termination. Furthermore,
Fox’s arguments that, based on “custom in the industry” and “trade-usage,” the 1958 statement
must have been incorporated are unavailing, because those aids to contract construction are not
used unless a contract is ambiguous. Transcontinental Gas Pipeline v. Texaco, 35 S.W.3d 658,
670 (Tex. App.—Houston [1st Dist.] 2000, no pet.); Printing Ctr. of Texas, Inc. v. Supermind
Pub. Co., Inc., 669 S.W.2d 779, 784 (Tex. App.—Houston [14th Dist.] 1984, no writ). Thus,
construing the contract as a matter of law, we find that the 1958 statement and its procedures were
not a part of Fox’s contract. Heritage Resources, 939 S.W.2d at 121; Lyons, 701 S.W.2d at 643. 
Therefore, those procedures for termination provide no basis to support the jury’s finding that
Baylor failed to comply with the employment contract. Merrell Dow Pharms., 953 S.W.2d at
711.
      The Pennsylvania Supreme Court has similarly construed the application of the 1958
statement. For example, in Murphy v. Duquesne University, the Court rejected a contention
almost identical to Fox’s. Murphy v. Duquesne University, 565 Pa. 571, 777 A.2d 428 (Pa.
2001). A tenured professor was accused by a student of sexual harassment, and the university
conducted an investigation. Id. 565 Pa. at 578, 777 A.2d at 422. The professor argued that the
1958 statement was not followed. Id. 565 Pa. at 599, 777 A.2d at 434. The Court said that, in
the documents comprising the employment contract, the university never “explicitly mentioned
or referred to or incorporated by reference the 1958 AAUP Statement,” and therefore it was not
part of the employment contract. Id. 565 Pa. at 600, 777 A.2d at 435.
      Finally, we address Fox’s argument that additional procedures apply which derive from policy
704. Policy 704 requires that tenured faculty cannot be terminated “unless adequate cause for
dismissal is demonstrated in a fair hearing, following established procedures of due process.” Fox
argues that the terms “fair hearing” and “due process” somehow enlarge on the procedures in
policy 705. Through this enlargement process, Fox asserts, Baylor was obligated to follow a host
of unwritten procedures, i.e., the eleven items listed in “Termination Procedures Asserted” above. 
But we find that policy 704 is a general provision whose intent is put into action by the specific
procedures in policy 705; and in contract construction, specific provisions control over general
provisions. Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 133-34 (Tex. 1994); Silver Spur v.
Clarksville Seniors, 848 S.W.2d 772, 775 (Tex. App.—Texarkana 1993, writ denied); Mid Plains
Reeves v. Farmland Industries, 768 S.W.2d 318, 321 (Tex. App.—El Paso 1989, writ denied). 
Therefore, policy 704 does not enlarge Baylor’s obligations beyond the express procedures in
policy 705. Thus, unenunciated procedures allegedly arising from policy 704 are not part of the
contract, and they provide no basis to support the jury’s finding that Baylor failed to comply with
the employment contract. Merrell Dow Pharms., 953 S.W.2d at 711.
      Therefore, we turn to a discussion of the evidence pertaining to the express procedures in
policy 705.
Policy 705
      The evidence conclusively shows that Baylor carefully followed the procedural steps in policy
705. After an investigation, an appropriate university official filed a charge with the Tenure
Committee. Fox was duly notified, and he filed an answer, which the Tenure Committee
reviewed, then found “probable cause” to proceed. A hearing was held in late August 1997 before
a properly comprised panel. Fox was represented by counsel at the hearing, which lasted three
days. Fox’s counsel made opening and closing statements, objected to evidence, cross-examined
the witnesses, and presented evidence. The Committee made thirty-three findings of incidents
which supported a “for cause” termination in satisfaction of policy 705. The President of Baylor
accepted the Tenure Committee’s recommendation and sent a letter of termination to Fox, who did
not at that time raise objections to the procedures that had been used. At trial, Fox’s expert
witness on tenured-faculty terminations testified that Baylor had followed the procedures in policy
705. We have searched the record diligently for evidence or inferences that Baylor did not
scrupulously follow the procedures the parties contracted for in policy 705, and we find a complete
absence of such evidence. Therefore, the evidence is legally insufficient to support the jury’s
finding that Baylor failed to comply with Fox’s employment contract. Merrell Dow Pharms., 953
S.W.2d at 711.
The 1983 tenure letter
      Fox makes one additional argument in his response brief which we must address. He
complains that Baylor’s President had no right to institute guidelines for termination hearings
shortly before Fox’s hearing. However, Fox’s April 1996 annual letter of employment, which he
signed and agreed to in April 1996, specifically says that his “complete contract with Baylor
consists of this letter of appointment and the applicable provisions of the Baylor University
Personnel Policy Manual, which Baylor may change from time to time.” (Emphasis added) There
is no ambiguity that the letter allowed for the amendment of policy 705, which thereby allowed
the President to institute guidelines. Heritage Resources, 939 S.W.2d at 121.
      Fox, however, argues that this letter does not cover the summer of 1996.


 (There are no
separate letters for summer employment in the record.) He says in his response brief that his
contract for the summer of 1996 was governed by a letter in 1983 which granted him tenure, not
by the April 1996 letter, and under the 1983 letter, the President was not authorized to institute
procedural guidelines. Therefore, when new guidelines were instituted before his termination
hearing in the summer of 1997, his rights that were established in 1983 were violated.
      Fox’s argument is unavailing. He did not plead the 1983 letter as his contract, and he testified
several times that the 1996 letter, which he introduced as an exhibit early in the trial, was his
contract. Also, each yearly letter reciting that Fox’s employment was extended contains his salary
for that year, and we assume he would not contend that the salary in the 1983 letter was the one
Baylor was obligated to pay in 1996-97. The logical conclusion is that each letter modified the
previous one. E.g., Cadle Co. v. Henderson, 982 S.W.2d 543, 546 (Tex. App.—San Antonio
1998, no pet.) (parties to a contract may modify it); Mid Plains Reeves, 768 S.W.2d at 321;
Mandril v. Kasishke, 620 S.W.2d 238, 244 (Tex. App.—Amarillo 1981, writ ref’d n.r.e.). In
fact, the 1983 letter implies future modifications because it says: “Summer session salaries are
based on the salaries for the preceding regular academic year.” The use of the plural “salaries”
implies that Fox’s salary in the summer of 1996 was based on his salary for the 1995-1996 school
year as set forth in his employment letter for that year, not as set forth in the 1983 letter. 
Furthermore, the 1983 letter, construed according to the plain meaning of its express wording,
granted Fox tenure and states that Baylor will follow its procedures when dealing with him. 
Lyons, 701 S.W.2d at 643. It does not guarantee that those procedures will never change. 
Finally, a letter extending employment was sent each year, and for some time those letters
contained the provision allowing Baylor to amend the policy manual. Fox signed each letter
agreeing to its terms. By signing each extension letter, Fox agreed to whatever modification of
his contract (and Baylor’s procedures) the letter might put into effect.



      For these reasons, Fox’s reliance on the 1983 letter fails, and we reject the argument as being
without evidentiary support. 
C. Sexual Harassment Investigation Procedures
      The second area in which Fox asserted procedural violations was an alleged obligation by 
Baylor to have the complaining students use the school’s Sexual Harassment Mediation Board or
Civil Rights Policy, which were alternative avenues for making a sexual harassment claim.


 The
Board and its related procedures were instituted but not officially replaced by the Civil Rights
Policy in 1995 or 1996, and the replacement was made official on June 24, 1997, the day after Fox
sued Baylor. Fox says he was entitled to have Baylor use the alternative avenues to investigate
and process the complaints against him. We note that the alternative avenues do not preclude the
termination process from being implemented simultaneously. But more importantly, as Baylor
points out, the purpose of these alternatives is to benefit students (and employees) who may have
been victims of sexual harassment; they are not for the benefit of an accused. Furthermore, the
evidence shows that Baylor did apprise the students that they could pursue their complaints
individually, but the students declined to do so. Thus, we find the evidence conclusively
establishes that Baylor did not violate sexual harassment procedures, because (a) he had no
entitlement and (b) Baylor adequately implemented the procedures. Therefore, we find no
evidence on this basis for the jury’s finding of non-compliance. Merrell Dow Pharms., 953
S.W.2d at 711.
D. Confidentiality Procedures
      Finally, the third area in which Fox asserted procedural violations concerns Fox’s assertion
that Baylor breached an obligation to not disclose information in Fox’s personnel file.


 He argues
that when Baylor informed the student witnesses of the pending investigation and termination
proceeding against Fox, it violated that obligation. News of the matter also was reported in the
student and city newspapers. Again, as Baylor points out, (1) the fact of the existence of the
investigation and proceeding was not strictly or solely in the personnel file, (2) Baylor had no
other way of gaining the participation of the witnesses except through revealing to them what was
occurring, and (3) the confidentiality policy explicitly provides that Baylor may disclose
information in a personnel file to protect its interests in an employment dispute. Furthermore, as
Fox admits in his brief, “[t]here was little to no evidence of this Breach presented at trial . . . .” 
(Response Brief of Appellant/Cross Appellee p. 56). We conclude that there is no evidence
to support this allegation, and therefore the evidence is legally insufficient on this basis to support
the jury’s finding of non-compliance. Merrell Dow Pharms., 953 S.W.2d at 711.
E. Summary
      Many of the procedures Fox claims Baylor was obligated to follow were not, as a matter of
law, part of the contract with Baylor. Of the procedures which Baylor agreed to, either there is
no evidence that Baylor did not follow them, or the evidence conclusively established that Baylor
followed them. We find the evidence legally insufficient to support the jury’s finding that Baylor
did not comply with the employment contract. Thus, unless one or more of Fox’s issues require
reversal, we will render judgment for Baylor.
II. FOX’S ISSUES
      Fox’s first issue is that the court erred in admitting evidence about settlement offers from
Baylor to Fox which he rejected, which evidence supported Baylor’s argument that he failed to
mitigate damages. However, because we have determined that Fox will take nothing on his
breach-of-contract claim against Baylor, this issue regarding damages is moot and we do not reach
it. For the same reason we do not reach his second through fifth issues complaining that the court
erred in not granting his motions for judgment notwithstanding the verdict regarding the amount
of damages, and that the amount of damages the jury awarded was against the great weight and
preponderance of the evidence. We turn now to those issues which might require a new trial or
another remedy.
A. Issues on the Parker Defamation Claim
      In a single question, the charge combined inquiries about defamatory statements and
proximate cause: “Did Judy Parker make defamatory statements about John Fox that proximately
caused injury to John Fox?” Fox objected at trial to the inclusion of the “proximate cause”
inquiry. In issues six and seven Fox argues that (a) the court erred in not ruling that Parker’s oral
and written statements to Baylor were defamatory per se, thus making the “proximate cause”
inquiry unnecessary, and (b) the jury’s finding on the Parker defamation issue is against the great
weight and preponderance of the evidence.
Defamation per se
      In a defamation case, assuming there is no dispute that certain statements were made, the court
should determine whether, as a matter of law, the complained-of statements are defamatory. Carr
v. Brasher, 776 S.W.2d 567, 570 (Tex. 1989); Kelly v. Diocese of Corpus Christi, 832 S.W.2d
88, 91 (Tex. App.—Corpus Christi 1992, writ dism’d w.o.j.). If the court finds the defamatory
nature of the words ambiguous, the jury should decide the issue. Id. But statements which accuse
of sexual harassment, as here, are defamatory per se, i.e., their defamatory nature need not be
demonstrated. E.g., Gray v. HEB Food Store #4, 941 S.W.2d 327, 329 (Tex. App.—Corpus
Christi 1997, writ denied). In a defamation per se, the law presumes that a person’s reputation
has been injured thereby. Leyendecker & Associates, Inc. v. Wechter, 683 S.W.2d 369, 374 (Tex.
1984). And he may recover “general” damages, such as for mental anguish, without proof of
injury. Id. Thus under normal circumstances in a case of defamation per se, there need be no
inquiry in the charge about whether there was a defamation or about “proximate cause” and injury
(or the jury may be instructed to so find).
      Fox, however, did not object to the inclusion of a question about whether a defamation
occurred; his objection was limited to the inclusion of an inquiry about “proximate cause.” The
resolution of this issue turns on the wording of the defamation damages question to which Fox did
not object. The question asked: “What sum of money . . . would fairly and reasonably
compensate John Fox for his damages, if any, proximately caused by such defamation? Consider
the following elements of damages . . . . Compensatory damages for pecuniary losses, excluding
wages and employment benefits, including damage to reputation, emotional pain, suffering, mental
anguish, loss of enjoyment of life in the past and/or in the future.” The problem for Fox lies in
the fact that the question includes “special” damages.
      “Actual” damages are divided into “general” (“direct”) and “special” (“consequential”)
damages. Arthur Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 816 (Tex. 1997);
Henry S. Miller Co. v. Bynum. 836 S.W.2d 160, 163 (Tex. 1992) (Phillips, C. J., concurring);
O’Connor’s Texas Causes of Action (2001-02), p. 755-56. “General” damages are those
conclusively presumed as a matter of law to have been foreseen by the defendant as a necessary
and usual result of the defendant’s wrongful act. Arthur Andersen, 945 S.W.2d at 816. They do
not have to be pled. Green v. Allied Interests, Inc., 963 S.W.2d 205, 208 (Tex. App.—Austin
1998, pet. denied). All other damages are “special” damages which must be foreseeable to the
defendant but are not the necessary and usual result of the wrong. Arthur Andersen, 945 S.W.2d
at 816. They must be specially pled. Tex. R. Civ. P. 56; Harkins v. Crews, 907 S.W.2d 51, 61
(Tex. App.—San Antonio 1995, writ denied).
      Thus the question combined “general” and “special” damages. Cagle, Cherry & Kemp, The
Classification of General & Special Damages for Pleading Purposes in Texas, 51 Baylor L. Rev.
629 (1999) (e.g., future damages are “special” damages). Fox cannot have the benefit of
“special” damages while at the same time rejecting a “proximate cause” inquiry which is required
for “special” damages. Under these circumstances, the court was correct to include “proximate
cause” in the defamation question.
      Alternatively, Fox did not object to the damages question which asked, conditioned on an
affirmative finding on the defamation question: “What sum of money . . . would fairly and
reasonably compensate John Fox for his damages, if any, proximately caused by such
defamation?” Thus the jury was asked to make a finding about “proximate cause” apart from the
part of the defamation question which inquired about it. By failing to object, Fox’s objection
about “proximate cause” in the defamation question becomes moot. Cf. Tex. R. App. P. 33.1(a).
      We overrule this issue.
Sufficiency of the evidence
      Fox argues that the negative finding on the Parker defamation question was against the great
weight and preponderance of the evidence. This is a factual-sufficiency complaint. When a party
who had the burden of proof complains of the factual insufficiency of an adverse finding, it must
demonstrate that the adverse finding is contrary to the great weight and preponderance of the
evidence. Dow Chemical Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001); Cropper v.
Caterpillar Tractor Co., 754 S.W.2d 646, 651-53 (Tex. 1988).
      In the defamation question, the term “defamatory statement” was defined as a “statement that
tends to injure a person’s reputation and, as a result, exposes a person to public hatred, contempt
or ridicule, or financial injury.” But because of the form of the question, we cannot determine
whether the jury found that Parker did not make any defamatory statements—which would appear
to be unsupportable under the definition of “defamatory statement” and the evidence—versus that
it found she did make defamatory statements but they did not proximately cause injury to Fox. 
This is always a potential problem under the broad-form submission rules under which trial courts
must operate. Tex. R. Civ. P. 277. But even if we assume that Parker made “defamatory
statements” as defined in the charge, Fox has not “demonstrate[d] that the adverse finding [about
proximate cause] is contrary to the great weight and preponderance of the evidence.” Dow
Chemical Co., 46 S.W.3d at 242.
      The primary complaint Fox made at trial was about the alleged breach of contract. Indeed
most of his evidence on damages concerned his lost wages and earning capacity related to the
contract claim, which were specifically excluded in the damages question on the defamation claim,
which said “excluding wages and employment benefits” while including “[c]ompensatory damages
for pecuniary losses . . . including damage to reputation, emotional pain, suffering, mental
anguish, loss of enjoyment of life in the past and/or in the future.” Because Fox’s emphasis was
on the breach-of-contract claim, the jury could reasonably have found that most of his injuries
derived from that claim. In addition, other students made statements to Baylor about Fox’s
behavior equally as damaging as Parker’s, although less in scope. The jury need not have
attributed any injuries from defamatory comments solely to Parker. In summary, Fox has not
demonstrated evidence of such magnitude to fulfill his burden to show that Parker’s statements
must have caused him injury. We overrule this issue.
B. Discovery Issues
      In issue eight, Fox argues that the court erred in denying his request to take a second
deposition of Parker concerning the diary of Shannon Mackay, which Fox alleges Parker failed
to timely produce. This failure also necessitated a costly second deposition of Mackay, and Fox
asserts in issue nine that the court should have imposed monetary sanctions against Baylor and
Parker for failing to produce the Mackay diary.
      Fox presents the complaint about the requested deposition “[i]n anticipation of a new trial.” 
(Brief of Appellant p. 42). Because we will reverse and render in favor of Baylor, we do not
reach this issue.
      Regarding the sanctions issue, a trial court has inherent power, subject to an abuse of
discretion standard, to impose sanctions not covered by rule or statute to discipline an attorney’s
behavior. E.g., In re Bennett, 960 S.W.2d 35, 40 (Tex. 1997). There was discrepant evidence
about whether Baylor had the diary; therefore the court did not abuse its discretion in refusing to
sanction Baylor. As for Parker, the evidence shows that the primary obstacle which caused Fox
so much delay and expense were the actions taken by Mackay’s lawyer in California (where the
deposition was to occur) in seeking to quash the deposition. We do not attribute that to Parker. 
Again, we do not find that the court abused its discretion. Accordingly, we overrule this issue.
C. Remaining Issues
      Issue 10 pertains to requested jury charge instructions which were denied. Issues 11 through
19 pertain to pre-trial rulings; these issues are presented “conditionally” in the event we grant a
new trial on Fox’s breach of contract action. Issues 20 and 21 pertain to Baylor’s motion for
summary judgment, granted by the court, concerning a claim by Fox of retaliation against him for
expressing opposition to what he considered discriminatory practices against employees on the
basis of religious belief.
      Issues 10, 20, and 21 are not briefed at all, and the remaining issues are not adequately
briefed. Our rules require that “[t]he brief must contain a clear and concise argument for the
contentions made, with appropriate citations to authority and to the record.” Tex. R. App. P.
38.1(h), 38.2(a)(1). This is especially important in a case such as this with a reporter’s record
consisting of many thousands of pages covering a four-week trial. By his failure, Fox has waived
review of these issues. E.g., Franklin v. Enserch, Inc., 961 S.W.2d 704, 711 (Tex.
App.—Amarillo 1998, no pet.); Sisters of Charity of the Incarnate Word v. Gobert, 992 S.W.2d
25, 31 (Tex. App.—Houston [1st Dist.] 1997, no pet.); Leyva v. Leyva, 960 S.W.2d 732, 734
(Tex. App.—El Paso 1997, no writ).
III. CONCLUSION
      Having found the evidence legally insufficient to support the jury’s finding that Baylor did not
comply with the employment contract, and finding Fox’s issues without merit, we reverse that part
of the judgment against Baylor and render a take-nothing judgment against Fox, and we affirm the
remainder of the judgment.


                                                                   BILL VANCE
                                                                   Justice

Before Chief Justice Davis,
      Justice Vance, and
      Justice Cummings (Sitting by Assignment)
Affirmed in part; reversed and rendered in part
Opinion delivered and filed January 15, 2003
[CV06]