

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

### NO. 02-12-00071-CV

| | | |
|---|---|---|
| Southwestern Bell Telephone, L.P. | § | From the 141st District Court |
| | § | of Tarrant County (141-208589-04) |
| v. | | |
| | § | January 24, 2013 |
| Richard D. Chappell | § | Opinion by Chief Justice Livingston |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was error in the trial court's judgment. It is ordered that the judgment of the trial court is reversed. We render judgment for appellant Southwestern Bell Telephone, L.P. on its breach of contract claim against appellee Richard D. Chappell for $106,990. We also remand the cause to the trial court for the limited purpose of considering the award of interest, attorney's fees, and costs.

It is further ordered that appellee Richard D. Chappell shall pay all of the costs of this appeal, for which let execution issue.

SECOND DISTRICT COURT OF APPEALS

By_____
Chief Justice Terrie Livingston



# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00071-CV

SOUTHWESTERN BELL     APPELLANT
TELEPHONE, L.P.

V.

RICHARD D. CHAPPELL     APPELLEE

----------

## FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In three issues, appellant Southwestern Bell Telephone, L.P. (Southwestern Bell) appeals the trial court's take-nothing judgment in favor of appellee Richard D. Chappell. We reverse and render in part and reverse and remand in part.

---

[1]*See* Tex. R. App. P. 47.4.

## Background Facts

Southwestern Bell employed Chappell as a sales representative. Chappell worked within the company's win-back group, which focused on contacting former commercial customers and attempting to make them long-term customers again. By the terms of his employment agreement, Chappell received commissions from the sales he made. To be entitled to receive and keep any commission on a win-back, Chappell had to make a sale to a new customer, that customer's lines had to be activated within six months of the sale, and that customer had to issue a "letter of authorization" to Southwestern Bell.

In February 2001, Chappell signed a "Document of Understanding" that stated in part,

> I specifically understand that I will receive sales compensation payouts based on components of the 2001 Sales Compensation Plan. These payouts assume that I am meeting the pre-established sales objectives and retention criteria for designated products and services. I understand that if my total sales results for the year or the portion of the year that I am on the Plan do not meet these objectives and criteria by end of year or by the month I leave the plan, and because the incentive plans are cumulative to the end of the year, I understand there are circumstances where I may have received more compensation than I have earned.

> In the event of any overpayment or chargeback, I understand the overpayment or chargeback will be deducted from future scheduled sales compensation . . . . If I am not a participant in the 2002 Sales Compensation Plan or I leave the 2001 Plan anytime during 2001, overpayment can be paid by sending a money order for the full amount to Southwestern Bell . . . . Upon 30 days of leaving the compensation plan, arrangements need to be made . . . for re-payment of any overpayments.

4

In the same month that he signed the Document of Understanding, Chappell signed a compensation election form in which he chose to be paid based on a smaller base salary and a larger "sales incentive." A year later, Chappell signed a document titled "Sales Compensation Administrative Guide and Policies," which stated,

> In the event of any overpayment, I understand and agree to repay the overpayment. While on the 2002 Plan [the overpayment] will be trued up with the next scheduled sales compensation payout(s). If I am not a participant in the 2003 Sales Compensation Plan or I leave the 2002 Plan anytime during 2002, remittance for the overpayment can be made by certified check . . . . The total amount shall be recovered within three (3) months or as prescribed by state law.
>
> . . . .
>
> If I refuse to repay an overpayment, or make arrangements to do so, within 30 days of being notified, I understand that [Southwestern Bell] has the right to initiate collection actions . . . .

Chappell acknowledges that he understood while working for Southwestern Bell that the effect of the documents that he signed in 2001 and 2002 was that he agreed to repay any overpayments, or "chargebacks," of commission that he had received from Southwestern Bell but that he was not ultimately entitled to.[2]

In December 2001, Chappell worked on a sale of approximately 1,300 lines of telephone service to Allstate Insurance Company (Allstate).

---

[2]According to Leslie Pendergrass, who is a Southwestern Bell sales manager, employees are entitled to keep a commission until the commission is "trued up and [Southwestern Bell has] documentation to show otherwise." [36, 39] Pendergrass described the "true up process [as] kind of like an auditing process."

5

Southwestern Bell paid Chappell a large commission from that sale in early 2002. Chappell resigned from Southwestern Bell in July 2002. At that time, he was aware that at least some commissions that he had made in 2001 were being charged back. He also knew that the Allstate sale was not final; he testified at trial that he had worked on the sale "in the beginning, and then it [had] got[ten] sent to . . . the implementation group." According to Chappell's testimony at trial, at the time he left his employment, he believed that the Allstate representative who had signed the agreement with Southwestern Bell had the authority to do so and that the sale would eventually be completed. But after resigning from Southwestern Bell, Chappell did not contact anyone at Southwestern Bell to check on the status of the sale.

Southwestern Bell eventually determined that almost five hundred of the lines that were to be part of the Allstate sale were already Southwestern Bell's lines and that the sale of the remaining lines could not be completed because the representative from Allstate who had signed the contract did not have the authority to bind individual Allstate franchisees. Chappell testified at trial, however, that he did not receive notice of any problem with the Allstate sale in 2002 or in the first several months of 2003.[3]

_____

[3]Pendergrass indicated that after Chappell left his employment with Southwestern Bell, he could have called one of Southwestern Bell's employees to learn whether the Allstate sale had been completed and whether he was entitled to keep the commission from that sale. Pendergrass also opined that Chappell should have investigated the status of the lines subject to the Allstate

Pendergrass, who worked with Southwestern Bell at the same time that Chappell did, testified that in 2002 and 2003, Southwestern Bell contacted individual Allstate franchisees to attempt to secure the sales of the lines that Chappell had originally attempted to sell. According to Pendergrass, Southwestern Bell did not begin the chargeback process in the summer of 2002 because it was attempting to "save the [Allstate] sale," which, according to Pendergrass, would have also saved Chappell's commission. Pendergrass did not know why, upon Chappell's resignation from the company, someone did not tell him that 491 lines that were part of the Allstate sale were already Southwestern Bell's customers and that he would need to return the commission associated with those lines.

In May 2003, Southwestern Bell sent two letters to Chappell stating that overpayments totaling $106,990 had occurred in September 2002 (which was after Chappell's employment had ended). The letters stated, "**It is your responsibility to reimburse the company for th[ese] erroneous payment[s].**" Also, the letters advised appellant to contact Southwestern Bell to arrange for payment and that if he did not, Southwestern Bell would consider "any and all appropriate means to attempt collection." Upon receiving the letters, Chappell called Southwestern Bell to ask what the overpayments related to, but Southwestern Bell did not contact appellant again until suing him in late 2004.

sale, including whether those lines were already Southwestern Bell's customers, before submitting the sale order.

7

Southwestern Bell pled that Chappell had breached his contract with Southwestern Bell by refusing to repay $106,990 in commissions. Chappell answered the suit by pleading laches. Specifically, Chappell asserted that Southwestern Bell's breach of contract claim should have been barred because Southwestern Bell was "unreasonable in asserting its request for reimbursement over a year after [Chappell] was paid the sales commissions" and because Chappell had already spent the commissions on living expenses and charitable donations. Chappell also asserted that the voluntary payment rule barred Southwestern Bell's suit.

After denying motions for summary judgment filed by both parties, the trial court conducted a bench trial in November 2011. During the trial, Chappell's counsel stated that if Southwestern Bell had notified Chappell sooner about repaying the commissions, Chappell would have done so. The parties then stipulated that Southwestern Bell had overpaid Chappell. After receiving all of the evidence, including testimony from Chappell, the trial court signed a take-nothing judgment against Southwestern Bell. The court also signed findings of fact and conclusions of law in which the court indicated that it had resolved the suit against Southwestern Bell based on laches. The trial court concluded that

    1.    [Chappell] did not repay unearned sales commissions as requested by [Southwestern Bell] in a letter . . . .

    2.    [Southwestern Bell] knew as early as May 24, 2002, that it had paid commissions to [Chappell] on the Allstate contract that were unearned.

3. [Southwestern Bell's] delay in requesting return of the unearned commissions paid to [Chappell] until its notice letter dated May 13, 2003, was an unreasonable delay.

4. [Chappell] made financial decisions to his detriment *due to [Southwestern Bell's] unreasonable delay in requesting the return of the unearned commissions* . . . .

5. Requiring [Chappell] to repay the unearned commissions under the extraordinary set of circumstances present in this case . . . would be a grave injustice to [Chappell]. [Emphasis added.]

Southwestern Bell filed a motion for new trial in which it contended that it had conclusively proved its breach of contract claim, that laches should not have applied to the claim based on the law or on the evidence presented at trial, and that, more particularly, there was "no evidence that . . . [Chappell] suffered any harm as a result of any . . . delay." In the motion for new trial, Southwestern Bell asked the trial court to award it $106,990 through a new judgment. The trial court did not expressly rule on the motion for new trial, and Southwestern Bell brought this appeal.

**The Trial Court's Erroneous Application of Laches**

In its first issue, Southwestern Bell contends that the trial court erred by entering its twelfth finding of fact. In its second issue, Southwestern Bell contends that the trial court erred by concluding that laches barred Southwestern Bell's breach of contract claim.

Laches is an affirmative defense. *See* Tex. R. Civ. P. 94 ("In pleading to a preceding pleading, a party shall set forth affirmatively . . . laches . . . and any

9

other matter constituting an avoidance or affirmative defense."); *In re Bahn*, 13 S.W.3d 865, 871 (Tex. App.—Fort Worth 2000, orig. proceeding). Thus, in the trial court, Chappell had the burden to prove the elements of laches by a preponderance of the evidence. *See Moore v. Kitsmiller*, 201 S.W.3d 147, 151 (Tex. App.—Tyler 2006, pet. denied); *Ballard v. Breigh*, 262 S.W. 886, 891 (Tex. Civ. App.—Fort Worth 1924, no writ).

Breach of contract claims are subject to a four-year statute of limitations. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 203 (Tex. 2011). "Generally[,] in the absence of some element of estoppel or such extraordinary circumstances as would render inequitable the enforcement of [a plaintiff's] right after a delay, laches will not bar a suit short of the period set forth in the limitation statute." *Barfield v. Howard M. Smith Co. of Amarillo*, 426 S.W.2d 834, 840 (Tex. 1968). When it applies,[4] laches requires proof of an unreasonable delay in

---

[4]In part of its second issue, relying on a decision from the Corpus Christi Court of Appeals, Southwestern Bell argues that as a matter of law, laches cannot bar a breach of contract claim. *See Wayne v. A.V.A. Vending, Inc.*, 52 S.W.3d 412, 415 (Tex. App.—Corpus Christi 2001, pet. denied) (holding that laches applies in a defense against the assertion of equitable rights and may not be used to defend against "breach of contract, a legal right"); *but see City of Fort Worth v. Johnson*, 388 S.W.2d 400, 403 (Tex. 1964) (indicating that laches may apply in a case concerning legal rights); *Regent Intern. Hotels, Ltd. v. Las Colinas Hotels Corp.*, 704 S.W.2d 101, 106 (Tex. App.—Dallas 1985, no writ) (explaining that although "some appellate courts have viewed laches as a defense against the enforcement of equitable rights, the Texas Supreme Court and many appellate courts have included legal rights as well"). Because our resolution of another argument presented by Southwestern Bell requires us to reverse the trial court's judgment and to render judgment for Southwestern Bell on its breach of contract claim, we decline to address whether laches generally

10

asserting a right to relief and a "good faith and detrimental change in position *because of the delay*." *In re Laibe Corp.*, 307 S.W.3d 314, 318 (Tex. 2010) (orig. proceeding) (emphasis added); *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 229 (Tex. App.—Fort Worth 2009, pet. denied) ("A party asserting the defense of laches must show both an unreasonable delay by the other party in asserting its rights and harm resulting to it because of the delay."), *cert. denied*, 130 S. Ct. 2061 (2010); *see also Gulf, Colo. & Santa Fe Ry. Co. v. McBride*, 159 Tex. 442, 453, 322 S.W.2d 492, 500 (1958) (op. on reh'g) ("Mere lapse of time raises no presumption of laches.  It must be an unreasonable delay which has worked injury to another person."); *Mandril v. Kasishke*, 620 S.W.2d 238, 242 (Tex. Civ. App.—Amarillo 1981, writ ref'd n.r.e.) ("The burden of proving the essential elements of laches is on the party asserting it, and the failure to prove any one or more of the elements is fatal.").

In part of its second issue, Southwestern Bell contends that Chappell presented "no evidence that he detrimentally changed his position" because of the delay in Southwestern Bell's informing him that it was charging back $106,990.  We construe this argument, along with Southwestern Bell's request for rendition of a judgment in its favor, as a challenge to the legal sufficiency of the evidence to prove the prejudice element of Chappell's laches affirmative

---

applies to breach of contract claims.  *See* Tex. R. App. P. 47.1; *Dickinson v. Dickinson*, 324 S.W.3d 653, 659 n.2 (Tex. App.—Fort Worth 2010, no pet.).

11

defense. *See Milton M. Cooke Co. v. First Bank & Trust*, 290 S.W.3d 297, 302 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions and are reviewable for legal sufficiency of the evidence to support them by the same standards. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see also MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009). Conclusions of law may not be challenged for evidentiary sufficiency, but they may be reviewed to determine their correctness based upon the facts. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller*

*v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). But when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

In its tenth finding of fact, the trial court determined that Chappell received notice of an overpayment of commissions in May 2003. In its twelfth finding of fact, the trial court found that because of Southwestern Bell's unreasonable delay in "the handling of the request for reimbursement of commissions, [Chappell] made charitable contributions; twice paid income taxes on the commissions from the Allstate contract; and . . . used the remainder of the commissions paid to him for . . . normal living expenses[,] which for all purposes, [Chappell was] unable to recover once paid." Southwestern Bell contends that there is no evidence to support the latter finding.

The evidence at trial established that Chappell made the Allstate sale in late December 2001. He received a commission from that sale in "roughly" February 2002. Before receiving the commission, in 2001, Chappell gave $22,637 to his church; Chappell conceded at trial that this donation had "nothing to do with" the Allstate sale. Chappell also gave $10,325 to his church in February 2002, which was shortly after he received the commission but was

13

before Southwestern Bell learned that he was not entitled to it.[5] Chappell testified that the $10,325 donation in February 2002 was the only donation that year that was "tied to any of the orders that [were] the basis of the chargebacks" at issue. Thus, because Chappell's 2001 donations to his church were made before he received the Allstate commission and because the February 2002 donation was made before Southwestern Bell was aware that Chappell was not entitled to the commission, we conclude that there is no evidence to support the trial court's finding that Southwestern Bell's alleged "unreasonable delay in the handling of the request for reimbursement of commissions" caused Chappell to make charitable contributions that he otherwise would not have made.

Next, the evidence does not establish that Chappell "twice paid income taxes on the commissions from the Allstate contract."[6] Through exhibits at trial, Chappell introduced his 2001 and 2002 tax returns. We have located no evidence, however, establishing that Chappell's 2001 tax liability was related to his February 2002 commission from the Allstate sale. Chappell's 2002 tax return

---

[5]The record indicates, and the trial court found, that the earliest date Southwestern Bell received notice that there were problems with any of the lines subject to the Allstate sale was May 2002. Texas courts have held that the relevant period of delay for laches does not begin until a cause of action matures. *See Stergios v. Forest Place Homeowners' Ass'n, Inc.*, 651 S.W.2d 396, 401 (Tex. App.—Dallas 1983, writ ref'd n.r.e.); *Yeo v. Yeo*, 581 S.W.2d 734, 740 (Tex. Civ. App.—San Antonio 1979, writ ref'd n.r.e.).

[6]We will examine the sufficiency of the evidence to support this finding even though Chappell contends in his brief that his tax payments are "not relevant to any issue in this case."

14

reported $150,594 as income from "wages," which presumably includes the commission from the Allstate sale. At trial, Chappell testified that he would not have paid taxes on the commission if he had known that Southwestern Bell wanted it back. But he also stated that he was aware that it was possible to amend a tax return. During his testimony, he engaged in the following exchange with Southwestern Bell's counsel:

> Q. And you're aware that if you find an error that would result in you getting a larger return, then you can [resubmit a tax return], right?
>
> A. Right.
>
> Q. And you can actually get back that tax money, right?
>
> A. I'm assuming so.
>
> Q. If everything goes the way it should, you should get that money back?
>
> A. Right.

Because Chappell acknowledged at trial that he could have amended his tax return to reduce his 2002 tax liability and because he received Southwestern Bell's demand for payment in May 2003, when amending the 2002 return was legally appropriate,[7] we conclude that there is no evidence to prove that

---

[7]We take judicial notice that federal law allows three years from the time a tax return is filed to claim a refund or credit for the overpayment of an imposed tax. *See* 26 U.S.C.A. § 6511(a) (West 2011); *see also* Tex. R. Evid. 202 (stating that a court may take judicial notice of a public statute at any stage of a proceeding).

Southwestern Bell's alleged unreasonable delay in demanding payment prejudiced Chappell with regard to his taxes.

Finally, for two reasons, the evidence does not raise anything more than a surmise or suspicion that Chappell detrimentally changed his position with respect to household expenses because of the delay in demanding payment until May 2003.[8] First, at trial, Chappell testified that after subtracting the $10,325 that he gave to his church from the commissions that Southwestern Bell overpaid, he spent the remaining money on household bills, including house payments. Chappell admitted, however, that he had "no idea" and could not "even guess" about how much of the money he spent between the time he received it in 2002 and the time that he received Southwestern Bell's May 2003 letters that demanded repayment. When Southwestern Bell's counsel asked Chappell whether he could testify that he had spent even more than $1,000 on household bills, Chappell replied, "I have no idea what the total amount was."

Second, even if Chappell had presented specific testimony about spending part of the commission on household bills between the time that Southwestern Bell learned that he was not entitled to the commission and the time that it notified him of that fact, Chappell did not present evidence that he incurred or paid any particular household expense that he would not have otherwise incurred

---

[8]Chappell testified that other than donations to his church and taxes, the only other payments made based on an assumption that he would be able to keep the Allstate commission were household bills.

16

or paid if he would have been notified of his duty to repay the commission earlier. Chappell testified generally that he spent money that he would not have spent if he had known before May 2003 he was not entitled to the commissions, but Chappell did not testify about when this money was spent (critically, whether the money was spent before or after Southwestern Bell learned of the overpayment), how the money was spent (for example, on the aforementioned donation to his church or on household expenses), or how much of the overall commission was spent before he received Southwestern Bell's letters in May 2003. Moreover, we note that in an analogous case in which a bank waited many months before suing to collect deficiencies after foreclosing on real property, we held that neither the appellants' assumption of more debt in the interim period nor the accrual of interest on the deficiencies in the interim period were "extraordinary" circumstances that justified applying laches. *Brink v. Fid. Bank of Fort Worth*, 966 S.W.2d 684, 685 (Tex. App.—Fort Worth 1998, no pet.).

For all of these reasons, we hold that there is not more than a scintilla of evidence to support the trial court's findings that there was a detrimental change in Chappell's financial position that was caused by Southwestern Bell's delay between the time that it learned of the overpayment of commissions until May 2003, when it demanded that Chappell repay them. *See Martinez*, 977 S.W.2d at 334. Therefore, the trial court's related conclusion of law that the delay caused Chappell to suffer financial detriment is incorrect. *See Marchand*, 83 S.W.3d at 794.

17

Chappell argues that the trial court's judgment is alternatively supportable by the court's conclusion of law that requiring Chappell to "repay the unearned commissions under the extraordinary set of circumstances present in this case . . . would be a grave injustice." The supreme court has stated that laches should not bar an action on which a statute of limitations has not run unless allowing the action would cause a grave injustice. *Caldwell v. Barnes*, 975 S.W.2d 535, 538 (Tex. 1998). We have not found any authority, however, indicating that a finding of a grave injustice may support laches when evidence of one of the basic elements of laches (an unreasonable delay and harm caused by the delay) is lacking, and the supreme court has indicated otherwise. *See id.* (describing "a good faith change of position by another to his detriment" as an "essential element[] of laches").

Because we hold that there is not more than a scintilla of evidence to support the trial court's twelfth finding of fact and that the trial court's resulting conclusion of law about an essential element of Chappell's laches affirmative defense—prejudice caused by the delay—is incorrect, we sustain Southwestern Bell's first and second issues.

**Voluntary Payment Rule**

In its third issue, Southwestern Bell contends that the voluntary payment rule did not bar its breach of contract claim. The common law voluntary payment rule provides that "money voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, duress, or compulsion, cannot be

18

recovered back merely because the party at the time of payment was ignorant of or mistook the law as to his liability." *Miga v. Jensen*, 299 S.W.3d 98, 103 (Tex. 2009). The supreme court has indicated that the voluntary payment rule does not apply in a breach of a contract suit. *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 775 (Tex. 2005) ("It is true that, to the extent the subject matter of Peake's claims is covered by the parties' contract, the [voluntary payment] rule would not apply."); *see also Tex. S. Rentals, Inc. v. Gomez*, 267 S.W.3d 228, 243 (Tex. App.—Corpus Christi 2008, no pet.) ("[T]he voluntary payment defense does not apply to a simple breach of contract action."). The trial court did not make findings of fact or conclusions of law based on the voluntary payment rule, and appellee does not contend that application of the rule supports the trial court's judgment. Thus, we sustain appellant's third issue and hold that the trial court's judgment cannot be supported by the voluntary payment rule. *See* Tex. R. Civ. P. 299 ("The judgment may not be supported upon appeal by a presumed finding upon any ground of recovery or defense, no element of which has been included in the findings of fact . . . ."); *Victore Ins. Co. v. City of Bowie*, 23 S.W.3d 499, 504 (Tex. App.—Fort Worth 2000, pet. denied).

**Conclusion and Disposition**

When we sustain a legal sufficiency issue, it is our duty to render judgment for the appellant because that is the judgment the trial court should have rendered. *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 595 (Tex. 2008); *Vista Chevrolet, Inc. v. Lewis*, 709 S.W.2d 176, 176 (Tex. 1986); *see* Tex. R. App. P.

19

43.3; *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 748 (Tex. App.—Fort Worth 2008, pet. dism'd).  In the trial court, Chappell stipulated that apart from his laches affirmative defense, he owed Southwestern Bell the money that Southwestern Bell was seeking in its breach of contract suit.  Thus, having sustained each of Southwestern Bell's three issues, we reverse the trial court's judgment, and we render judgment for Southwestern Bell on its breach of contract claim for $106,990.  *See* Tex. R. App. P. 43.2(c), 43.3.  Southwestern Bell has asked us to remand this case to the trial court for the limited purpose of allowing the trial court to consider awarding "interest, attorneys' fees, and costs," and we do so.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West 2008); Tex. R. App. P. 43.2(d); *Rey v. Lara*, No. 02-11-00002-CV, 2011 WL 6260871, at *4 (Tex. App.—Fort Worth Dec. 15, 2011, no pet.) (mem. op.) (remanding a case for a determination of awarding attorney's fees after reversing a trial court's take-nothing judgment on a breach of contract claim and rendering judgment on the contract for the appellant).

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

DELIVERED:  January 24, 2013

20