02-12-071-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00071-CV

 


 
 
 Southwestern
 Bell Telephone, L.P.
  
  
 v.
  
  
 Richard
 D. Chappell
 
 
 §
  
 §
  
 §
  
 §
 
 
 From the 141st District
 Court
  
 of
 Tarrant County (141-208589-04)
  
 January
 24, 2013
  
 Opinion
 by Chief Justice Livingston
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is reversed.  We render judgment for appellant Southwestern
Bell Telephone, L.P. on its breach of contract claim against appellee Richard
D. Chappell for $106,990.  We also remand the cause to the trial
court for the limited purpose of considering the award of interest, attorney’s
fees, and costs.

It is further ordered that appellee Richard
D. Chappell shall pay all of the costs of this appeal, for which let execution
issue.

 

SECOND DISTRICT COURT
OF APPEALS 

 

 

 

By_________________________________

    Chief Justice Terrie
Livingston

 

 

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-12-00071-CV

 

 


 
 
 Southwestern Bell Telephone, L.P.
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Richard D. Chappell
 
 
  
 
 
 APPELLEE
 
 


 

 

----------

FROM THE 141st
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

          In
three issues, appellant Southwestern Bell Telephone, L.P. (Southwestern Bell) appeals
the trial court’s take-nothing judgment in favor of appellee Richard D. Chappell. 
We reverse and render in part and reverse and remand in part.

Background Facts

          Southwestern
Bell employed Chappell as a sales representative.  Chappell worked within the company’s
win-back group, which focused on contacting former commercial customers and
attempting to make them long-term customers again.  By the terms of his employment
agreement, Chappell received commissions from the sales he made.  To be
entitled to receive and keep any commission on a win-back, Chappell had to make
a sale to a new customer, that customer’s lines had to be activated within six
months of the sale, and that customer had to issue a “letter of authorization”
to Southwestern Bell.

          In
February 2001, Chappell signed a “Document of Understanding” that stated in
part,

          I specifically understand that I will receive
sales compensation payouts based on components of the 2001 Sales Compensation
Plan.  These payouts assume that I am meeting the pre-established sales
objectives and retention criteria for designated products and services.  I
understand that if my total sales results for the year or the portion of the
year that I am on the Plan do not meet these objectives and criteria by end of
year or by the month I leave the plan, and because the incentive plans are
cumulative to the end of the year, I understand there are circumstances where I
may have received more compensation than I have earned.

          In the event of any overpayment or chargeback,
I understand the overpayment or chargeback will be deducted from future
scheduled sales compensation . . . .  If I am not a participant in the 2002
Sales Compensation Plan or I leave the 2001 Plan anytime during 2001,
overpayment can be paid by sending a money order for the full amount to
Southwestern Bell . . . .  Upon 30 days of leaving the compensation plan,
arrangements need to be made . . . for re-payment of any overpayments.

In
the same month that he signed the Document of Understanding, Chappell signed a
compensation election form in which he chose to be paid based on a smaller base
salary and a larger “sales incentive.”  A year later, Chappell signed a document
titled “Sales Compensation Administrative Guide and Policies,” which stated,

          In the event of any overpayment, I understand
and agree to repay the overpayment.  While on the 2002 Plan [the overpayment]
will be trued up with the next scheduled sales compensation payout(s).  If I am
not a participant in the 2003 Sales Compensation Plan or I leave the 2002 Plan
anytime during 2002, remittance for the overpayment can be made by certified
check . . . .  The total amount shall be recovered within three (3) months or
as prescribed by state law.

          . . . .

          If I refuse to repay an overpayment, or make
arrangements to do so, within 30 days of being notified, I understand that
[Southwestern Bell] has the right to initiate collection actions . . . .

Chappell
acknowledges that he understood while working for Southwestern Bell that the
effect of the documents that he signed in 2001 and 2002 was that he agreed to
repay any overpayments, or “chargebacks,” of commission that he had received from
Southwestern Bell but that he was not ultimately entitled to.[2]

          In
December 2001, Chappell worked on a sale of approximately 1,300 lines of telephone
service to Allstate Insurance Company (Allstate).  Southwestern Bell paid
Chappell a large commission from that sale in early 2002.  Chappell resigned
from Southwestern Bell in July 2002.  At that time, he was aware that at least
some commissions that he had made in 2001 were being charged back.  He also knew
that the Allstate sale was not final; he testified at trial that he had worked
on the sale “in the beginning, and then it [had] got[ten] sent to . . . the
implementation group.”  According to Chappell’s testimony at trial, at the time
he left his employment, he believed that the Allstate representative who had signed
the agreement with Southwestern Bell had the authority to do so and that the
sale would eventually be completed.  But after resigning from Southwestern
Bell, Chappell did not contact anyone at Southwestern Bell to check on the
status of the sale.

          Southwestern
Bell eventually determined that almost five hundred of the lines that were to
be part of the Allstate sale were already Southwestern Bell’s lines and that
the sale of the remaining lines could not be completed because the
representative from Allstate who had signed the contract did not have the
authority to bind individual Allstate franchisees.  Chappell testified at
trial, however, that he did not receive notice of any problem with the Allstate
sale in 2002 or in the first several months of 2003.[3]

          Pendergrass,
who worked with Southwestern Bell at the same time that Chappell did, testified
that in 2002 and 2003, Southwestern Bell contacted individual Allstate
franchisees to attempt to secure the sales of the lines that Chappell had originally
attempted to sell.  According to Pendergrass, Southwestern Bell did not begin
the chargeback process in the summer of 2002 because it was attempting to “save
the [Allstate] sale,” which, according to Pendergrass, would have also saved
Chappell’s commission.  Pendergrass did not know why, upon Chappell’s
resignation from the company, someone did not tell him that 491 lines that were
part of the Allstate sale were already Southwestern Bell’s customers and that
he would need to return the commission associated with those lines.

          In
May 2003, Southwestern Bell sent two letters to Chappell stating that
overpayments totaling $106,990 had occurred in September 2002 (which was after
Chappell’s employment had ended).  The letters stated, “It is your
responsibility to reimburse the company for th[ese] erroneous payment[s].” 
Also, the letters advised appellant to contact Southwestern Bell to arrange for
payment and that if he did not, Southwestern Bell would consider “any and all
appropriate means to attempt collection.”  Upon receiving the letters, Chappell
called Southwestern Bell to ask what the overpayments related to, but
Southwestern Bell did not contact appellant again until suing him in late 2004.

          Southwestern
Bell pled that Chappell had breached his contract with Southwestern Bell by refusing
to repay $106,990 in commissions.  Chappell answered the suit by pleading
laches.  Specifically, Chappell asserted that Southwestern Bell’s breach of
contract claim should have been barred because Southwestern Bell was
“unreasonable in asserting its request for reimbursement over a year after [Chappell]
was paid the sales commissions” and because Chappell had already spent the
commissions on living expenses and charitable donations.  Chappell also
asserted that the voluntary payment rule barred Southwestern Bell’s suit.

          After
denying motions for summary judgment filed by both parties, the trial court
conducted a bench trial in November 2011.  During the trial, Chappell’s counsel
stated that if Southwestern Bell had notified Chappell sooner about repaying
the commissions, Chappell would have done so.  The parties then stipulated that
Southwestern Bell had overpaid Chappell.  After receiving all of the evidence, including
testimony from Chappell, the trial court signed a take-nothing judgment against
Southwestern Bell.  The court also signed findings of fact and conclusions of
law in which the court indicated that it had resolved the suit against Southwestern
Bell based on laches.  The trial court concluded that

          1.       [Chappell] did not repay unearned sales
commissions as requested by [Southwestern Bell] in a letter . . . .

          2.       [Southwestern Bell] knew as early as
May 24, 2002, that it had paid commissions to [Chappell] on the Allstate
contract that were unearned.

          3.       [Southwestern Bell’s] delay in requesting
return of the unearned commissions paid to [Chappell] until its notice letter
dated May 13, 2003, was an unreasonable delay.

          4.       [Chappell] made financial decisions to
his detriment due to [Southwestern Bell’s] unreasonable delay in requesting
the return of the unearned commissions . . . .

          5.       Requiring [Chappell] to repay the
unearned commissions under the extraordinary set of circumstances present in
this case . . . would be a grave injustice to [Chappell].  [Emphasis added.]

          Southwestern
Bell filed a motion for new trial in which it contended that it had
conclusively proved its breach of contract claim, that laches should not have
applied to the claim based on the law or on the evidence presented at trial,
and that, more particularly, there was “no evidence that . . . [Chappell]
suffered any harm as a result of any . . . delay.”  In the motion for new
trial, Southwestern Bell asked the trial court to award it $106,990 through a
new judgment.  The trial court did not expressly rule on the motion for new
trial, and Southwestern Bell brought this appeal.

The
Trial Court’s Erroneous Application of Laches

          In
its first issue, Southwestern Bell contends that the trial court erred by
entering its twelfth finding of fact.  In its second issue, Southwestern Bell
contends that the trial court erred by concluding that laches barred
Southwestern Bell’s breach of contract claim.

          Laches
is an affirmative defense.  See Tex. R. Civ. P. 94 (“In pleading to a
preceding pleading, a party shall set forth affirmatively . . . laches . . .
and any other matter constituting an avoidance or affirmative defense.”); In
re Bahn, 13 S.W.3d 865, 871 (Tex. App.—Fort Worth 2000, orig. proceeding). 
Thus, in the trial court, Chappell had the burden to prove the elements of
laches by a preponderance of the evidence.  See Moore v. Kitsmiller, 201
S.W.3d 147, 151 (Tex. App.—Tyler 2006, pet. denied); Ballard v. Breigh,
262 S.W. 886, 891 (Tex. Civ. App.—Fort Worth 1924, no writ).

          Breach
of contract claims are subject to a four-year statute of limitations.  Exxon
Corp. v. Emerald Oil & Gas Co., 348 S.W.3d 194, 203 (Tex. 2011).  “Generally[,]
in the absence of some element of estoppel or such extraordinary circumstances
as would render inequitable the enforcement of [a plaintiff’s] right after a
delay, laches will not bar a suit short of the period set forth in the
limitation statute.”  Barfield v. Howard M. Smith Co. of Amarillo, 426
S.W.2d 834, 840 (Tex. 1968).  When it applies,[4] laches requires proof of an
unreasonable delay in asserting a right to relief and a “good faith and
detrimental change in position because of the delay.”  In re Laibe
Corp., 307 S.W.3d 314, 318 (Tex. 2010) (orig. proceeding) (emphasis added);
Frequent Flyer Depot, Inc. v. Am. Airlines, Inc., 281 S.W.3d 215, 229
(Tex. App.—Fort Worth 2009, pet. denied) (“A party asserting the defense of
laches must show both an unreasonable delay by the other party in asserting its
rights and harm resulting to it because of the delay.”), cert. denied,
130 S. Ct. 2061 (2010); see also Gulf, Colo. & Santa Fe Ry. Co. v.
McBride, 159 Tex. 442, 453, 322 S.W.2d 492, 500 (1958) (op. on reh’g) (“Mere
lapse of time raises no presumption of laches.  It must be an unreasonable
delay which has worked injury to another person.”); Mandril v. Kasishke,
620 S.W.2d 238, 242 (Tex. Civ. App.—Amarillo 1981, writ ref’d n.r.e.) (“The burden
of proving the essential elements of laches is on the party asserting it, and
the failure to prove any one or more of the elements is fatal.”).

          In
part of its second issue, Southwestern Bell contends that Chappell presented
“no evidence that he detrimentally changed his position” because of the delay
in Southwestern Bell’s informing him that it was charging back $106,990.  We
construe this argument, along with Southwestern Bell’s request for rendition of
a judgment in its favor, as a challenge to the legal sufficiency of the
evidence to prove the prejudice element of Chappell’s laches affirmative defense. 
See Milton M. Cooke Co. v. First Bank & Trust, 290 S.W.3d 297, 302
(Tex. App.—Houston [1st Dist.] 2009, no pet.).

          A
trial court’s findings of fact have the same force and dignity as a jury’s
answers to jury questions and are reviewable for legal sufficiency of the
evidence to support them by the same standards.  Catalina v. Blasdel,
881 S.W.2d 295, 297 (Tex. 1994); Anderson v. City of Seven Points, 806
S.W.2d 791, 794 (Tex. 1991); see also MBM Fin. Corp. v. Woodlands Operating
Co., 292 S.W.3d 660, 663 n.3 (Tex. 2009).  Conclusions of law may not be
challenged for evidentiary sufficiency, but they may be reviewed to determine
their correctness based upon the facts.  BMC Software Belgium, N.V.
v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002).

          We
may sustain a legal sufficiency challenge only when (1) the record
discloses a complete absence of evidence of a vital fact; (2) the court is
barred by rules of law or of evidence from giving weight to the only evidence
offered to prove a vital fact; (3) the evidence offered to prove a vital
fact is no more than a mere scintilla; or (4) the evidence establishes
conclusively the opposite of a vital fact.  Uniroyal Goodrich Tire Co. v.
Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S.
1040 (1999).  In determining whether there is legally sufficient evidence to
support the finding under review, we must consider evidence favorable to the
finding if a reasonable factfinder could and disregard evidence contrary to the
finding unless a reasonable factfinder could not.  Cent. Ready Mix Concrete
Co. v. Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson,
168 S.W.3d 802, 807, 827 (Tex. 2005).  Anything more than a scintilla of
evidence is legally sufficient to support the finding.  Cont’l Coffee Prods.
Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996); Leitch v. Hornsby,
935 S.W.2d 114, 118 (Tex. 1996).  But when the evidence offered to prove a
vital fact is so weak as to do no more than create a mere surmise or suspicion
of its existence, the evidence is no more than a scintilla and, in legal
effect, is no evidence.  Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63
(Tex. 1983).

          In
its tenth finding of fact, the trial court determined that Chappell received
notice of an overpayment of commissions in May 2003.  In its twelfth finding of
fact, the trial court found that because of Southwestern Bell’s unreasonable
delay in “the handling of the request for reimbursement of commissions,
[Chappell] made charitable contributions; twice paid income taxes on the
commissions from the Allstate contract; and . . . used the remainder of the
commissions paid to him for . . . normal living expenses[,] which for all
purposes, [Chappell was] unable to recover once paid.”  Southwestern Bell contends
that there is no evidence to support the latter finding.

          The
evidence at trial established that Chappell made the Allstate sale in late
December 2001.  He received a commission from that sale in “roughly” February
2002.  Before receiving the commission, in 2001, Chappell gave $22,637 to his
church; Chappell conceded at trial that this donation had “nothing to do with”
the Allstate sale.  Chappell also gave $10,325 to his church in February 2002,
which was shortly after he received the commission but was before Southwestern
Bell learned that he was not entitled to it.[5]  Chappell testified that
the $10,325 donation in February 2002 was the only donation that year that was
“tied to any of the orders that [were] the basis of the chargebacks” at issue. 
Thus, because Chappell’s 2001 donations to his church were made before he
received the Allstate commission and because the February 2002 donation was made
before Southwestern Bell was aware that Chappell was not entitled to the
commission, we conclude that there is no evidence to support the trial court’s
finding that Southwestern Bell’s alleged “unreasonable delay in the handling of
the request for reimbursement of commissions” caused Chappell to make
charitable contributions that he otherwise would not have made.

          Next,
the evidence does not establish that Chappell “twice paid income taxes on the
commissions from the Allstate contract.”[6]  Through exhibits at
trial, Chappell introduced his 2001 and 2002 tax returns.  We have located no
evidence, however, establishing that Chappell’s 2001 tax liability was related
to his February 2002 commission from the Allstate sale.  Chappell’s 2002 tax
return reported $150,594 as income from “wages,” which presumably includes the
commission from the Allstate sale.  At trial, Chappell testified that he would
not have paid taxes on the commission if he had known that Southwestern Bell
wanted it back.  But he also stated that he was aware that it was possible to
amend a tax return.  During his testimony, he engaged in the following exchange
with Southwestern Bell’s counsel:

          Q.    And you’re aware that if you find an
error that would result in you getting a larger return, then you can [resubmit
a tax return], right?  

          A.    Right.

          Q.    And you can actually get back that tax
money, right?

          A.    I’m assuming so.

          Q.    If everything goes the way it should, you
should get that money back?

          A.    Right.

Because
Chappell acknowledged at trial that he could have amended his tax return to
reduce his 2002 tax liability and because he received Southwestern Bell’s
demand for payment in May 2003, when amending the 2002 return was legally
appropriate,[7] we conclude that there is
no evidence to prove that Southwestern Bell’s alleged unreasonable delay in
demanding payment prejudiced Chappell with regard to his taxes.

          Finally,
for two reasons, the evidence does not raise anything more than a surmise or
suspicion that Chappell detrimentally changed his position with respect to
household expenses because of the delay in demanding payment until May 2003.[8] 
First, at trial, Chappell testified that after subtracting the $10,325 that he
gave to his church from the commissions that Southwestern Bell overpaid, he
spent the remaining money on household bills, including house payments.  Chappell
admitted, however, that he had “no idea” and could not “even guess” about how
much of the money he spent between the time he received it in 2002 and the time
that he received Southwestern Bell’s May 2003 letters that demanded repayment. 
When Southwestern Bell’s counsel asked Chappell whether he could testify that
he had spent even more than $1,000 on household bills, Chappell replied, “I
have no idea what the total amount was.”

          Second,
even if Chappell had presented specific testimony about spending part of the
commission on household bills between the time that Southwestern Bell learned
that he was not entitled to the commission and the time that it notified him of
that fact, Chappell did not present evidence that he incurred or paid any particular
household expense that he would not have otherwise incurred or paid if he would
have been notified of his duty to repay the commission earlier.  Chappell
testified generally that he spent money that he would not have spent if he had
known before May 2003 he was not entitled to the commissions, but Chappell did
not testify about when this money was spent (critically, whether the money was
spent before or after Southwestern Bell learned of the overpayment), how the
money was spent (for example, on the aforementioned donation to his church or
on household expenses), or how much of the overall commission was spent before
he received Southwestern Bell’s letters in May 2003.  Moreover, we note that in
an analogous case in which a bank waited many months before suing to collect
deficiencies after foreclosing on real property, we held that neither the
appellants’ assumption of more debt in the interim period nor the accrual of
interest on the deficiencies in the interim period were “extraordinary”
circumstances that justified applying laches.  Brink v. Fid. Bank of Fort
Worth, 966 S.W.2d 684, 685 (Tex. App.—Fort Worth 1998, no pet.).

          For
all of these reasons, we hold that there is not more than a scintilla of
evidence to support the trial court’s findings that there was a detrimental
change in Chappell’s financial position that was caused by Southwestern Bell’s
delay between the time that it learned of the overpayment of commissions until
May 2003, when it demanded that Chappell repay them.  See Martinez,
977 S.W.2d at 334.  Therefore, the trial court’s related conclusion of law that
the delay caused Chappell to suffer financial detriment is incorrect.  See
Marchand, 83 S.W.3d at 794.

          Chappell
argues that the trial court’s judgment is alternatively supportable by the
court’s conclusion of law that requiring Chappell to “repay the unearned
commissions under the extraordinary set of circumstances present in this case . . .
would be a grave injustice.”  The supreme court has stated that laches should
not bar an action on which a statute of limitations has not run unless allowing
the action would cause a grave injustice.  Caldwell v. Barnes, 975
S.W.2d 535, 538 (Tex. 1998).  We have not found any authority, however,
indicating that a finding of a grave injustice may support laches when evidence
of one of the basic elements of laches (an unreasonable delay and harm caused
by the delay) is lacking, and the supreme court has indicated otherwise.  See
id. (describing “a good faith change of position by another to his
detriment” as an “essential element[] of laches”).

          Because
we hold that there is not more than a scintilla of evidence to support the
trial court’s twelfth finding of fact and that the trial court’s resulting
conclusion of law about an essential element of Chappell’s laches affirmative
defense—prejudice caused by the delay—is incorrect, we sustain Southwestern
Bell’s first and second issues.

Voluntary
Payment Rule

          In
its third issue, Southwestern Bell contends that the voluntary payment rule did
not bar its breach of contract claim.  The common law voluntary payment rule
provides that “money voluntarily paid on a claim of right, with full knowledge
of all the facts, in the absence of fraud, duress, or compulsion, cannot be
recovered back merely because the party at the time of payment was ignorant of
or mistook the law as to his liability.”  Miga v. Jensen, 299 S.W.3d 98,
103 (Tex. 2009).  The supreme court has indicated that the voluntary payment
rule does not apply in a breach of a contract suit.  BMG Direct Mktg., Inc.
v. Peake, 178 S.W.3d 763, 775 (Tex. 2005) (“It is true that, to the extent
the subject matter of Peake’s claims is covered by the parties’ contract, the
[voluntary payment] rule would not apply.”); see also Tex. S. Rentals, Inc.
v. Gomez, 267 S.W.3d 228, 243 (Tex. App.—Corpus Christi 2008, no pet.)
(“[T]he voluntary payment defense does not apply to a simple breach of contract
action.”).  The trial court did not make findings of fact or conclusions of law
based on the voluntary payment rule, and appellee does not contend that
application of the rule supports the trial court’s judgment.  Thus, we sustain
appellant’s third issue and hold that the trial court’s judgment cannot be
supported by the voluntary payment rule.  See Tex. R. Civ. P. 299 (“The
judgment may not be supported upon appeal by a presumed finding upon any ground
of recovery or defense, no element of which has been included in the findings
of fact . . . .”); Victore Ins. Co. v. City of Bowie, 23 S.W.3d 499, 504
(Tex. App.—Fort Worth 2000, pet. denied).

Conclusion
and Disposition

          When
we sustain a legal sufficiency issue, it is our duty to render judgment for the
appellant because that is the judgment the trial court should have rendered.  AutoZone,
Inc. v. Reyes, 272 S.W.3d 588, 595 (Tex. 2008); Vista Chevrolet, Inc. v.
Lewis, 709 S.W.2d 176, 176 (Tex. 1986); see Tex. R. App. P. 43.3; City
of The Colony v. N. Tex. Mun. Water Dist., 272 S.W.3d 699, 748 (Tex. App.—Fort
Worth 2008, pet. dism’d).  In the trial court, Chappell stipulated that apart
from his laches affirmative defense, he owed Southwestern Bell the money that Southwestern
Bell was seeking in its breach of contract suit.  Thus, having sustained each
of Southwestern Bell’s three issues, we reverse the trial court’s judgment, and
we render judgment for Southwestern Bell on its breach of contract claim for
$106,990.  See Tex. R. App. P. 43.2(c), 43.3.  Southwestern Bell has
asked us to remand this case to the trial court for the limited purpose of
allowing the trial court to consider awarding “interest, attorneys’ fees, and
costs,” and we do so.  See Tex. Civ. Prac. & Rem. Code Ann. §
38.001(8) (West 2008); Tex. R. App. P. 43.2(d); Rey v. Lara, No. 02-11-00002-CV,
2011 WL 6260871, at *4 (Tex. App.—Fort Worth Dec. 15, 2011, no pet.) (mem. op.)
(remanding a case for a determination of awarding attorney’s fees after
reversing a trial court’s take-nothing judgment on a breach of contract claim
and rendering judgment on the contract for the appellant).

 

 

 

TERRIE LIVINGSTON
CHIEF JUSTICE

 

PANEL: 
LIVINGSTON,
C.J.; GARDNER and WALKER, JJ.

 

DELIVERED:  January 24, 2013









[1]See Tex. R. App. P. 47.4.





[2]According to Leslie
Pendergrass, who is a Southwestern Bell sales manager, employees are entitled
to keep a commission until the commission is “trued up and [Southwestern Bell
has] documentation to show otherwise.”  [36, 39] Pendergrass described the
“true up process [as] kind of like an auditing process.”





[3]Pendergrass indicated that
after Chappell left his employment with Southwestern Bell, he could have called
one of Southwestern Bell’s employees to learn whether the Allstate sale had
been completed and whether he was entitled to keep the commission from that
sale.  Pendergrass also opined that Chappell should have investigated the
status of the lines subject to the Allstate sale, including whether those lines
were already Southwestern Bell’s customers, before submitting the sale order.





[4]In part of its second
issue, relying on a decision from the Corpus Christi Court of Appeals,
Southwestern Bell argues that as a matter of law, laches cannot bar a breach of
contract claim.  See Wayne v. A.V.A. Vending, Inc., 52 S.W.3d 412, 415
(Tex. App.—Corpus Christi 2001, pet. denied) (holding that laches applies in a
defense against the assertion of equitable rights and may not be used to defend
against “breach of contract, a legal right”); but see City of Fort Worth v.
Johnson, 388 S.W.2d 400, 403 (Tex. 1964) (indicating that laches may apply
in a case concerning legal rights); Regent Intern. Hotels, Ltd. v. Las
Colinas Hotels Corp., 704 S.W.2d 101, 106 (Tex. App.—Dallas 1985, no writ)
(explaining that although “some appellate courts have viewed laches as a defense
against the enforcement of equitable rights, the Texas Supreme Court and many
appellate courts have included legal rights as well”).  Because our resolution
of another argument presented by Southwestern Bell requires us to reverse the
trial court’s judgment and to render judgment for Southwestern Bell on its
breach of contract claim, we decline to address whether laches generally
applies to breach of contract claims.  See Tex. R. App. P. 47.1; Dickinson
v. Dickinson, 324 S.W.3d 653, 659 n.2 (Tex. App.—Fort Worth 2010, no pet.).





[5]The record indicates, and
the trial court found, that the earliest date Southwestern Bell received notice
that there were problems with any of the lines subject to the Allstate sale was
May 2002.  Texas courts have held that the relevant period of delay for laches
does not begin until a cause of action matures.  See Stergios v. Forest
Place Homeowners’ Ass’n, Inc., 651 S.W.2d 396, 401 (Tex. App.—Dallas 1983,
writ ref’d n.r.e.); Yeo v. Yeo, 581 S.W.2d 734, 740 (Tex. Civ. App.—San
Antonio 1979, writ ref’d n.r.e.).





[6]We will examine the
sufficiency of the evidence to support this finding even though Chappell
contends in his brief that his tax payments are “not relevant to any issue in
this case.”





[7]We take judicial notice
that federal law allows three years from the time a tax return is filed to
claim a refund or credit for the overpayment of an imposed tax.  See 26
U.S.C.A. § 6511(a) (West 2011); see also Tex. R. Evid. 202 (stating that
a court may take judicial notice of a public statute at any stage of a
proceeding).





[8]Chappell testified that
other than donations to his church and taxes, the only other payments made
based on an assumption that he would be able to keep the Allstate commission
were household bills.